**In re KINGSTON SQUARE ASSOCIATES, et al., Debtors.**

**Bankruptcy Nos. 96 B 44962, 96 B 46340 TLB.**

United States Bankruptcy Court, S.D. New York.

Sept. 24, 1997.

Skadden, Arps, Slate, Meagher & Flom, L.L.P. by Michael L. Cook, Jerome S. Hirsch, Kayalyn A. Marafioti, Christopher R. Gene, NY, for The Chase Manhatten Bank, N.A., as Trustee, and REFG Investor Two, Inc.

Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen, P.C. by Peter R. Sarasohn, Kenneth A. Rosen, Bruce Buechler, Roseland, NJ, for Debtors.

Pryor, Cashman, Sherman & Flynn by Peter D. Wolfson, Richard Levy, Jr., NY, for Petitioning Creditors.

O'Sullivan, Graev & Karabell, L.L.P. by J. Douglas Richards, Bradley J. Butwin, NY, for Laurence Richardson.

Stephen I. Munzer & Associates, P.C. by Stephen I. Munzer, Justin A. Summer, NY, for Certain Limited Partners.

Lynch, Rowin, Novack, Burnbaum & Crystal, P.C. by Marc Rowin, NY, for Morris Herman Family Partnership et al.

## AMENDED OPINION DENYING MOTION OF THE CHASE MANHATTAN BANK, N.A. AND REFG INVESTOR TWO, INC. TO DISMISS THESE CHAPTER 11 CASES UNDER § 1112(b) AND GRANTING MOTION TO APPOINT CHAPTER 11 TRUSTEE

TINA L. BROZMAN, Chief Judge.

### Introduction

Fashion has a role not only in the garment industry but in the legal one as well. One of the newest fashions in commercial real estate financing is so-called "mortgage backed securitization" coupled with the presence of corporate governance provisions known as "bankruptcy remote provisions" designed to make bankruptcy unavailable to a defaulting borrower without the affirmative consent of the mortgagee's designee on the borrower's board of directors.

Here, a group of entities owning apartment complexes was stymied by such provisions from invoking the chapter 11 process to prevent foreclosure despite the belief of their principal that the properties had value over and above the encumbrances against them. To prevent loss of this claimed value and the potential for reorganization, the debtors' principal paid a law firm to solicit creditors to file involuntary chapter 11 petitions. Only one trade creditor for each debtor agreed; the other petitioning creditors came from the ranks of the debtors' professionals—attorneys and various consultants. At issue is whether the petitions ought therefore be dismissed as bad faith filings, relief which the mortgagees seek.

By agreement of the parties, the only issue at trial was whether there was collusion mandating dismissal, for it was the mortgagee's contention that, standing alone, collusion in their filing warranted dismissal of these petitions. The parties have not yet tried whether there is any possibility of reorganization.

I conclude that although the debtors plainly orchestrated the filing of the involuntary petitions, they had reason to believe that reorganization was possible and did not circumvent any court-ordered or statutory re-

strictions on bankruptcy filings such that, absent any evidence of objective futility of the reorganization process, the cases ought not be dismissed now. However, because there is a strong suggestion in the record that the debtors' boards of directors have abdicated their fiduciary responsibilities, I am directing the appointment of chapter 11 trustees, relief for which the mortgagees asked in the alternative and as to which the Debtors have consented.[1]

The facts are drawn from the undisputed portion of the parties' pretrial order and from the evidence adduced during three days of testimony.

## I.

Each of the eleven debtors (the "Debtors") is or was controlled by Morton L. Ginsberg. The Debtors represent less than one-third of the thirty-eight Ginsberg-controlled entities that were restructured in 1991 or 1993 in transactions financed by The Chase Manhattan Bank, N.A. ("Chase") and REFG Investor Two, Inc. ("REFG") (the "Movants"). All thirty-eight properties, both debtor and nondebtor, are in receivership, with foreclosure proceedings pending against them. In one case, that of Lynnewood Associates, the Movants have foreclosed upon the property. The Debtors did not contest the filing of the involuntary petitions, with the result that orders for relief have been entered in all eleven cases.

Chase and REFG seek the dismissal of the chapter 11 cases of the eleven Debtors for cause pursuant to section 1112(b) of the Bankruptcy Code. The Movants maintain that Ginsberg colluded with the petitioning creditors ("Petitioning Creditors") and their counsel, Pryor, Cashman, Sherman & Flynn ("Pryor Cashman"), to enable each Debtor to improperly avail itself of bankruptcy protection to thwart the Movants' ongoing efforts to foreclose on each of the Debtors' properties. Objections to the dismissal motion have been filed by the Debtors, the Petitioning Creditors, and the limited partners of the Florida Debtors[2], Lynnewood Associates[3], and Highland–Montgomery, L.P.[4]

### A. The Debtors.

The eleven Debtors can be grouped readily into three categories corresponding roughly to their geographical location—Florida, The Bronx, and Metropolitan New York.

The Florida Debtors consist of Kingston Square Associates ("Kingston Square"), Montego Associates ("Montego"), and Kings Court Associates ("Kings Court"). Involuntary petitions were filed against these entities on September 16, 1996. Each debtor owns a single parcel of multi-family real property located in Plantation, Florida. Ginsberg is the president of the corporate general partner of each Florida Debtor.

The Bronx Debtors consist of Pierson Property Corp. ("Pierson"), Kingsbridge Company, L.P. ("Kingsbridge"), Silliman Property Corp. ("Silliman"), 2440 Olinville Properties Corp. ("Olinville") and Leland Company, L.P. ("Leland"). Their involuntary petitions were filed on October 8, 1996. Two of these Bronx Debtors, Kingsbridge and Leland, own a single parcel apartment complex. Ginsberg is the president of each

---

1. Notwithstanding the Debtors' consent to the appointment of chapter 11 trustees, the mortgagees have pressed their request for dismissal of these cases.

2. As I describe below, the Florida Debtors are Kingston Square Associates, Montego Associates, and Kings Court Associates.

3. The limited partners of the Florida Debtors and Lynnewood Associates filed a joint objection to the motion to dismiss. These parties include:

 Kingston Square Associates: Alberto A. Vitale, Louis Cimino, Jeanie Severino, and Clement Vicari.

 Montego Associates: Kalman S. Leibowitz, Saliendra Sinha, Ralph F. Tompkins, Richard Struhl, Ruth Struhl, and Stanley S. Weinstein.
 Kings Court Associates: Oscar Dystel, Maurice Greenfield, Kathleen H. Kepler, Ruth H. Kurz, John Looney, and Ruth Glantz.
 Lynnewood Associates: Louis K. Staz and Ruth Kurz.
 I will refer to these parties as the "Kingston Square Limited Partners."

4. The Highland limited partners opposing the motion to dismiss are: Morris Herman Family Partnership, M. Ostreicher Family Partnership, Michael Berliner, and Kalman Teitelbaum. I will refer to them as the "Highland Limited Partners."

debtor's corporate general partner. The other three Bronx Debtors collectively own one apartment complex, known as Winthrop Gardens. Ginsberg is the president of each of these three corporate debtors.

The Metropolitan New York Debtors consist of Brandywine Associates ("Brandywine"), Highland–Montgomery, L.P. ("Highland"), and Lynnewood Associates ("Lynnewood"). Ginsberg is the president of the corporate general partner of each. Like the Florida and Bronx debtors, the Metropolitan New York Debtors own multi-family apartment complexes. Their petitions were filed on October 11, November 12, and November 21, respectively.

None of the Debtors currently has any employees.

### B. The Lenders.

Chase is the trustee for the benefit of the holders of the DLJ Mortgage Acceptance Corp., Multi–Family Mortgage Pass–Through Certificates. MF Series 1991–1. The beneficial holder of these securities is REFG Investor One, Inc., all of whose outstanding shares are owned by an entity related to Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ")[5]. Chase is the mortgageholder for the properties of the Florida Debtors. Brandywine and Highland–Montgomery. Pursuant to a Pooling and Servicing Agreement dated as of August 1, 1991, Chase designated DLJ to take all acts on Chase's behalf to enforce the mortgages.

REFG is the trustee for the benefit of the holders of the DLJ Mortgage Acceptance Corp., Multi–Family Mortgage Pass–Through Certificates, MF Series 1993–2. All of its outstanding shares are owned by DLJ. REFG is the mortgageholder for properties of the Bronx Debtors.

The MF Series 1991–1 and Series 1993–2 certificates were underwritten by DLJ. DLJ packaged these certificates in a relatively

new form of real estate financing known as "commercial mortgage backed securitization" in which debt securities would be issued to investors, with repayment secured by a pool of mortgages on various real properties. Beginning in late 1994, DLJ repurchased all the certificates for both the MF Series 1991–1 and MF Series 1993–2 from investors.

### C. The MLG I and MLG II Transactions.

The Debtors became indebted to the Movants pursuant to two loan transactions. In the first, known as MLG I, Chase lent slightly more than $132 million to twenty multi-family entities including the Florida and Metropolitan New York Debtors and took back a mortgage on each property. This transaction closed on August 30, 1991. Chase holds a single blanket mortgage containing cross-collateralization and cross-default provisions for fifteen of the twenty properties. Chase holds individual mortgages on the five remaining properties.

In the second loan transaction, known appropriately enough as MLG II, REFG lent nearly $145.25 million to eighteen multi-family entities including the Bronx Debtors and took back a mortgage on each property. This transaction closed on February 11, 1993. All eighteen properties are covered by one blanket mortgage with cross-collateralization and cross-default provisions.

Integral to the MLG I and II transactions was the inclusion in the charters of each corporate Debtor or the corporate general partner of each limited partnership Debtor of a bylaw, commonly referred to as a "bankruptcy remote" or "bankruptcy proof" provision, to prevent the Debtors from seeking voluntary bankruptcy protection without the unanimous consent of the board of directors of each Debtor or of its corporate general partner and the shareholders. Each board originally consisted of Ginsberg and two others[6], one of whom was his designee and the

---

**5.** The term "DLJ" in this opinion includes all affiliates and/or subsidiaries of Donaldson, Lufkin & Jenrette Securities Corporation.

**6.** Joseph Kazarnovsky, Morton Ginsberg and Laurence Richardson are the directors for the Florida Debtors, Brandywine, Lynnewood and

Highland–Montgomery. Ginsberg and Richardson are the directors for the remaining five Debtors.

other of whom was a so-called independent director.

The independent director for each board of directors is Laurence Richardson. Richardson received his law degree from the University of Virginia in 1983 and was employed as an associate at Thacher Profitt & Wood, a New York law firm, until 1986 in the residential mortgage backed securities area. After a two-year stint at E.F. Hutton beginning in 1986, Richardson worked at DLJ from February 1988 until April 1991 as a vice president. Upon his departure, he became a consultant to DLJ for the MLG I transaction as well as others. He was paid hourly for his consulting fees and received the sum of $25,000 per year for being a director for companies included in both the MLG I and II transactions.[7] Richardson's director's fees were originally paid by the management companies handling the properties and then later by the receivers. At some point, when the fees went into arrears, it was DLJ whom Richardson called to inquire about who was responsible for bringing the fees current. Richardson admits having received some of his director's fees from REFG. which at that time he did not know was a wholly-owned subsidiary of DLJ.

Richardson serves as an independent director for three other entities at the request of DLJ, receiving $10,000 per year per transaction. Therefore, Richardson receives the aggregate amount of $55,000 annually for serving on the various boards of directors created pursuant to DLJ-structured deals.

*D. The Foreclosure Proceedings.*

In 1994, the Movants issued notices of default and commenced foreclosure actions against each property, Debtor and nondebtor. With the consent of each borrower, receivers were installed at all thirty-eight properties. As of mid–1996, the Movants had obtained judgments totaling approximately $370 million and had commenced foreclosure proceedings against each of the thirty-eight properties.

Specifically with regard to the Debtors, on October 7, 1994, Chase commenced foreclosure proceedings against the Florida Debtors, Brandywine, Highland–Montgomery and Lynnewood Associates. On December 23, 1994, Bradley S. Weiss was appointed as receiver to manage all the Florida Debtors. Chase obtained judgments of foreclosure on August 13, 1996; these judgments were not appealed. The foreclosure sales of the Florida Debtors that were scheduled for September 17, 1996 were stayed by the filing the previous day of the involuntary chapter 11 petitions. This is no coincidence; these Debtors were targeted for the first involuntary filings precisely because foreclosure was imminent.

On October 6, 1994, Chase instituted a foreclosure action against Brandywine. On December 21, 1994, Kenneth A. Auerbach was appointed as receiver. Brandywine's involuntary petition was filed on the day that its papers opposing Chase's summary judgment motion were due.

On November 7, 1994 Chase entered a confession of judgment in its favor from Lynnewood Associates. On November 16, 1996, the property held by Lynnewood Associates was sold at foreclosure sale. Lynnewood Associates' involuntary petition was filed the day its brief in support of appeal of its motion to reopen the confession of judgment was due, thereby staying that appeal.

On October 6, 1994, Chase began its foreclosure action against Highland–Montgomery. By consent order dated December 14, 1994, NHP was appointed as receiver. On August 20, 1996, Chase received a judgment of foreclosure. The involuntary petition filed on November 12, 1996 against Highland–Montgomery stayed the foreclosure sale scheduled for the next day.

On November 1, 1994, REFG commenced foreclosure proceedings in New York against the Bronx Debtors. On February 16, 1995, NHP Management Company was appointed as receiver to manage the Bronx Debtors. Although REFG had obtained judgments in its favor, it had not taken any steps to en-

---

7. Richardson receives $10,000 per year for the MLG I properties and $15,000 for the MLG II properties. Neither Ginsberg nor Joseph Kazar-

novsky, the other two directors, receives any remuneration for his services as a director. All three individuals are indemnified.

force them against the Bronx Debtors prior to the involuntary bankruptcy filings. Currently, these judgments are on appeal.

### E. The Debtors' Financial Picture.

In the almost two years that the receivers have been in place, the Movants have advanced nearly $2 million to pay for repairs, taxes and insurance. No monies have been needed for salaries because the Debtors have no employees.

While no breakdown has been provided as to the number of apartment units for each of the Debtors, the thirty-eight Debtor and non-debtor properties in total aggregate nearly 11,200 units spread over approximately 41 garden apartment complexes. The only appraisal received into evidence, dated November 1, 1995 and prepared by Allen V. Trauben & Associates ("Trauben"), valued all the properties at $384 million. Ex. 65. If the values contained in the appraisal were found to be correct, equity may exist in the properties. However, the appraisal was admitted for the limited purpose of rebutting the charge that the friendly involuntary petitions were filed in bad faith. As noted at the outset of this decision, the parties agreed in their pretrial order not to treat reorganization prospects initially, as a result of which there is no developed record regarding valuation.

### F. The Petitioning Creditors.

The Petitioning Creditors are:

Stelco Distributors, Inc. ("Stelco"),
Allen V. Trauben & Associates ("Trauben"),
Pasternak, Feldman & Plutnick, P.A. ("Pasternak"),
Eugene M. Kennedy, P.A. ("Kennedy"),
Embassy Elevator, Inc. ("Embassy"),
Peri & Stewart, and
Eugene Miller & Co.

Pasternak, Feldman & Plutnick, P.A. ("Pasternak") is a New Jersey law firm that has represented Brandywine, Highland–Montgomery and the Bronx Debtors in New Jersey foreclosure suits commenced by REFG. Pasternak's arrangement with these Debtors was to render legal services for all of the Debtors and nondebtors located in New York, New Jersey and Pennsylvania for a flat rate of $25,000 per month. As of the petition date, the Debtors owed Pasternak the sum of $300,000. Ginsberg acknowledged the validity of this debt on September 19, 1996.

Eugene Miller & Co., a real estate consulting firm, holds a claim for $75,000 against Lynnewood for real estate consultation services. According to Eugene Miller, certain of the Debtors including Lynnewood were obligated to pay him $1,000 per month representing payment of real estate commissions due from the sale of real estate to the Debtors and for other services rendered in association with the property. This arrangement was intended to be open-ended, continuing for as long as the Debtors owned the property. Trauben's claims are held jointly and severally against the Debtors.

The following table provides, for each Debtor, the date of each Debtor's involuntary petition together with a listing of the Petitioning Creditors who signed its involuntary petition as well as the amount and basis of the claims each Petitioning Creditor holds:

| Debtor | Date of Petition | Petitioning Creditors | Amount of Debt | Type of Services Rendered |
|---|---|---|---|---|
| Kingston Square Associates | 9/16/96 | Trauben | 55,000.00 | Appraisal Services |
| | | Kennedy | 6,489.53 | Legal Services |
| Kings Court Associates | 9/16/96 | Stelco | 8,685.40 | Sale of Air Conditioning Equipment |
| | | Trauben | 55,000.00 | Appraisal Services |
| | | Kennedy | 6,489.53 | Legal Services |
| Montego Associates | 9/16/96 | Stelco | 449.11 | Sale of Air Conditioning Equipment |
| | | Trauben | 55,000.00 | Appraisal Services |
| | | Kennedy | 6,489.53 | Legal Services |
| Leland Associates | 10/8/96 | Pasternak | 300,000.00 | Legal Services |
| | | Embassy Elevator | 30,260.00 | Elevator Repair |
| | | Trauben | 55,000.00 | Appraisal Services |
| Pierson Properties | 10/8/96 | Pasternak | 300,000.00 | Legal Services |
| | | Embassy Elevator | 3,794.15 | Elevator Repair |
| | | Trauben | 55,000.00 | Appraisal Services |

| Debtor | Date of Petition | Petitioning Creditors | Amount of Debt | Type of Services Rendered |
|---|---|---|---|---|
| Silliman Properties Corp. | 10/8/96 | Pasternak | 300,000.00 | Legal Services |
| | | Embassy Elevator | 8,641.35 | Elevator Repair |
| | | Trauben | 55,000.00 | Appraisal Services |
| Kingsbridge Company | 10/8/96 | Pasternak | 300,000.00 | Legal Services |
| | | Embassy Elevator | 8,680.84 | Elevator Repair |
| | | Trauben | 55,000.00 | Appraisal Services |
| 2440 Olinville Properties Corp. | 10/8/96 | Pasternak | 300,000.00 | Legal Services |
| | | Embassy Elevator | 3,794.15 | Elevator Repair |
| | | Trauben | 55,000.00 | Appraisal Services |
| Brandywine Associates | 10/11/96 | Pasternak | 300,000.00 | Legal Services |
| | | Trauben | 55,000.00 | Appraisal Services |
| Highland Montgomery | 11/12/96 | Pasternak | 300,000.00 | Legal Services |
| | | Trauben | 55,000.00 | Appraisal Services |
| Lynnewood Gardens | 11/21/96 | Trauben | 55,000.00 | Real Estate Consulting Services |
| | | Eugene Miller & Co. | 75,000.00 | Legal Services |
| | | Peri & Stewart | 2,988.88 | Legal Services |
| | | Pasternak | 300,000.00 | Legal Services |

### G. Pryor, Cashman, Sherman & Flynn.

Pryor Cashman represents the Petitioning Creditors. Peter D. Wolfson, Esq., a partner in that firm, testified that Edward Weisfelner, Esq. of the firm of Berlack, Israels & Liberman ("Berlack"), which Ginsberg had consulted to possibly represent the Debtor, invited him to attend a meeting on July 25, 1996 to discuss a "fairly complicated real estate transaction, that there was [sic] some Petitioning Creditors that were interested in filing an involuntary," and that Weisfelner had recommended Wolfson to them. R. 501[8]. This meeting, which Wolfson described as a preliminary one that ran about 45 minutes, was attended by Wolfson, Pasternak, Ginsberg, Arthur Israel (Ginsberg's personal attorney) and Weisfelner. During this meeting, Wolfson became acquainted generally with the story of the Debtors, the MLG transactions, the foreclosure actions, and the bankruptcy remote provisions. In addition, it was related to him that involuntary petitions needed to be filed in order to salvage the Debtors, and that legal theories might exist for suit against DLJ. Wolfson advised the parties that he would require an advance of $50,000 for fees and $25,000 for expenses in the event he decided to take on the representation.

Thereafter, Wolfson commenced due diligence to verify the Debtors' story and determine whether to accept the representation.

As part of this process, Wolfson sought documents and more information regarding, *inter alia*, the financial and physical conditions of the properties, the state court foreclosure actions, the existence of potential third parties interested in purchasing the properties or funding a plan of reorganization, and identities of the creditors. Wolfson also researched the viability of pursuing an equitable subordination action against the Movants.

After conducting a substantial portion of his investigation and before any involuntary petition was filed, Wolfson concluded that equity existed in the properties which likely would be lost at foreclosure and that unless creditors caused the Debtors to file for bankruptcy, the "unsecured creditors and limited partners would end up getting zero .... wiped out." R. 559. At that point, Wolfson decided to represent the Petitioning Creditors and arranged for the opening of a client billing matter at Pryor Cashman. Two hitches remained: (1) identification of creditors willing to sign involuntary petitions, and (2) how would Pryor Cashman be paid.

Pryor Cashman tried to deal with both issues simultaneously. According to its time records[9], during the period from mid-September through early mid-November, Pryor Cashman personnel spoke, or attempted to speak, with Ginsberg or his agents on 49 occasions, while conversing with the Petition-

---

**8.** The trial transcript will be referred to as "R." for record, followed by the specific page upon which the cited testimony appears. Exhibit will refer to the document that was admitted into evidence during the hearings.

**9.** Exhibit 97 contains a redacted version of the time records for the period September 5, 1996 through December 31, 1996.

ing Creditors on 12 occasions. Wolfson denied that he had any agreements with Ginsberg as to future payments of fees, or actions to take or to avoid. Wolfson conceded that he and other personnel at Pryor Cashman were in frequent communication with Ginsberg, ostensibly so as to obtain documents and information necessary to assist Wolfson in deciding to take on the cases and later, after making that decision, to obtain information to locate other available petitioning creditors.

Wolfson admitted that part of the problem with the early stages of Pryor Cashman's due diligence was determining which creditors actually constituted its client, and just as importantly, who would be footing the bill for his firm's services. Wolfson believed that Ginsberg would be one of the Petitioning Creditors, but he "never stepped up to the plate." R. 615. Wolfson believed that Arthur Israel would also join or at least pay the initial retainer of $75,000. But Israel never returned the proposed retainer letter, so Wolfson turned to Pasternak, R. 615, who was reluctant to sign on because of (i) his concern under the New Jersey attorney disciplinary rules as to the propriety of being a Petitioning Creditor and (ii) his unwillingness to commit another $75,000 after he was already owed $300,000, a debt which was of a sufficient magnitude that it caused him to have to take out a second mortgage on his house and draw down a credit line.

On September 18, 1996, Pryor Cashman started a campaign to locate potential creditors to file involuntary petitions by circulating a letter to creditors of the Bronx Debtors. Later, letters were also sent to approximately ten trade creditors of the other Debtors. The letters exhorted each recipient to join as a Petitioning Creditor by highlighting the fact that Pryor Cashman's fees would be paid by an undisclosed entity so that there would be no out-of-pocket cost to the Petitioning Creditors.

As it turned out, the "undisclosed entity" mentioned in the letter was Homestead Associates, Ltd., an entity controlled by Ginsberg, which advanced $75,000 to Pryor Cashman to cover its fees and expenses for pursuing the involuntary petitions. Later, David Lichtenstein, a stranger to the MLG transactions who was first introduced to these cases by Ginsberg and appeared as a party interested in funding a plan, paid $25,000 to Pryor Cashman.[10]

## H. Inaction by the Boards of Directors.

As each director, Kazarnovsky, Ginsberg and Richardson, testified, no meetings were held after the closing of the MLG I and II restructurings until December 16, 1996. At no other time was any meeting ever called, special or regular, to discuss the business activities of the Debtors, the defaults called by the Movants, or the commencement of the foreclosure actions. The directors conducted no business except to approve the $2.4 million loan to the Debtors to provide maintenance for the properties in June 1993. Other than this minor matter, they had little communication with each other, either by telephone or by letter, until this motion was filed. No financial reports were circulated, nor were reports or updates on the legal proceedings distributed either by counsel or by Ginsberg, as president, to the other directors.

The directors testified as to the reasons for such inactivity, even in the face of the foreclosure actions, the installation of receivers and the filing of the involuntary petitions. Both Ginsberg and Kazarnovsky believed that involving Richardson in such meetings would prove fruitless because of their belief that Richardson was simply a pawn of DLJ and would not approve any course of action that would interfere with DLJ's plans. R. 311–12. Because both Kazarnovsky and Ginsberg believed that Richardson was DLJ's agent on the board, they purposely ignored him.[11] Significantly, the boards took

---

**10.** Lichtenstein also advanced the retainer of $125,000 to Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen, P.C., the Debtors' counsel, to represent the Debtors. Objections have been interposed to that firm's representation of the Debtors and the firm was retained, on the con-

sent of all parties, only on an initial basis to defend against this motion.

**11.** Kazarnovsky stated that he believed that following the procedures to attempt to authorize a

no action in the face of foreclosure actions being commenced or receivers being installed. Although Ginsberg did retain counsel to contest the foreclosure proceedings in the state courts on behalf of the Debtors, there is no indication that the attorneys ever reported to anyone other than Ginsberg. Richardson learned in 1995 that the properties were being foreclosed, R. 341, yet he took no action and did not seek any information from anyone as to what was happening although he assumed judgments would be entered against the properties. R. 345–46. In any event, he never initiated communication with Ginsberg regarding these events nor did he ask for a directors' meeting. *Id.*

Richardson's overall testimony at trial was enlightening on a number of topics including his perception of his fiduciary duty as a director, the purpose of the bankruptcy proof provision and his understanding of DLJ's status. Richardson seems not to have taken any interest at all in the properties. He testified that as a director he never reviewed any documents regarding any of the Debtors including rent rolls, judgments, or state court decisions. R. 402. While apparently unaware of the foreclosure actions against all the properties until 1995, Richardson did acknowledge that he was certainly aware of the status of his directors' fees and made a number of inquiries of DLJ when his fees were in arrears. R. 328–31.

According to his testimony, only long after the filing of the involuntary petitions did he become aware that a director has fiduciary duty not only to a corporation's shareholders but to its creditors when the corporation becomes insolvent.[12] Nor did he comprehend his obligations to limited partners in those entities where he was on the board of directors of the corporate general partners.

Richardson candidly admitted that from his appointment as a director to the Debtors' boards in 1993 until December 1996 he believed that his duty was to the shareholders whom he identified as Ginsberg. R. 352. But Richardson's statement does not quite square with his later testimony when he described seeking DLJ's advice about resigning from the boards sometime in 1995. Richardson sought an answer from DLJ because he was under the impression that because DLJ had become the shareholder by virtue of its foreclosure of Ginsberg's equity interests and DLJ was now the owner of all the securities, "they became the investor who relied upon my independence to avoid a bankruptcy." R. 397. In any event, Richardson had no idea until well into the midst of these cases that he had a fiduciary duty to anyone other than shareholders.

Richardson also testified that he had no knowledge of the involuntary bankruptcy proceedings until the board meetings of December 16–17 at which time he learned about the recent activity from Ginsberg and Wolfson. R. 354. This is an astounding statement to make in light of Richardson's filing an affidavit in this case at least two weeks earlier that was prepared by the Movants' counsel regarding the lack of board meetings during the preceding years. Ex. 93. On direct examination by Debtors' counsel, this court learned that Richardson, an attorney who has been involved in substantial financial transactions and admits to reading "carefully" formal documents presented to him, R. 356, somehow failed to understand or recognize the fact that a two page affidavit, drawn up with a typical bankruptcy caption and referring to "debtors" throughout, related to a bankruptcy case.[13] Richardson did not seem to question the fact that he was being asked to sign an affidavit, an action which he

---

bankruptcy proceeding would be a "futile action." R. 295–98, 309.

**12.** "I have learned since being involved in these proceedings that upon the insolvency of a debtor corporation that the directors have a duty to the creditors." R. 348. As it turned out, Richardson had learned of these duties from his personal counsel, Douglas Richards, Esq. of O'Sullivan

Graev & Karabell, LLP, in December 1996. Richardson had been referred to that firm by Movants' counsel, Skadden Arps.

**13.** "It was a very simple affidavit asking whether we had board meetings, so I just signed it. I didn't notice it had anything to do with a bankruptcy." R. 355.

admits to having done "very rarely." R. 359. He failed to question what the proposed use of the affidavit was or why the Movants were seeking a sworn statement from him regarding corporate governance issues. There is no question that he read the affidavit because he suggested changes in it to Movants' counsel. R. 357–58. The average person would certainly inquire as to what was being signed; I would hazard a guess that an attorney not in the habit of executing affidavits would scrutinize such a document even more carefully.

Only after my strong suggestion, voiced during a December 5, 1996 hearing [14], was a directors' meeting convened. Over the course of two days, December 16 and 17, 1996, the board met telephonically and in person. The board heard from counsel representing the Petitioning Creditors and the Movants as to the legal issues involved in the various state proceedings, the instant motion, and the ramifications of voting in favor of filing voluntary petitions and authorizing the appointment of a chapter 11 trustee.

Richardson's actions at the two-day board meeting in mid-December 1996 were also somewhat peculiar. Admittedly, all the parties present were at pains to apologize for not having met sooner, and there was a need for Richardson especially to be brought up to speed regarding the overall status of both the Debtors and nondebtors. Debtors' counsel was present to advise the board and Pryor Cashman presented the Petitioning Creditors' position on the first day. At Richardson's insistence, Movants' counsel was invited into the board meeting on the second day to answer a number of questions from him. After mulling over the presentations and cursorily reviewing the papers he had been sent, Richardson refused to vote on the question as to whether the Debtors should ratify the filing of the involuntary petitions until he received answers from the parties to questions he had. Ex. 96 at 254.

Two votes were taken during the board meetings. On the first, the question of filing for bankruptcy, Richardson abstained while Ginsberg and Kazarnovsky voted in favor of ratifying the involuntary filings. Given the unanimity requirement for a bankruptcy filing, an abstention was a pocket veto. In the discussion on this issue, Richardson advised his fellow board members that he would request information from the parties before deciding on how to vote. It took him five weeks to make his request, at which time he circulated an eleven page letter to counsel for the Petitioning Creditors, the Debtors, the Highland Limited Partners and the Movants, asking extensive questions regarding the issues brought up in the documents provided to him by the parties at the directors' meetings. Ex. 94. This was a transparent stalling tactic, the effect of which was to prevent ratification of the filings. As to the second vote, the three directors voted unanimously in favor of the appointment of a chapter 11 trustee or trustees for these cases.

Finally, Richardson gave his interpretation of what the bankruptcy proof provision was all about. R. 333, 393–98. As he read the bylaw, its purpose was to place an "independent" director on the corporate boards of directors to prevent, in the event that Ginsberg filed for personal bankruptcy, Ginsberg's filing from "suck[ing]" all of these properties into that proceeding," R. 333, 393, in order that, as Richardson further explained, "a creditor of Mort Ginsberg would not be able to say that somehow there was a corporate sham and therefore be able to pull these assets in." R. 395. Interestingly, Richardson claims not to have known that DLJ had foreclosed on Ginsberg's equity interests, (at odds with other of his testimony; see R. 397) thereby making itself shareholder, but he did inquire as to whether he should resign as director after learning that DLJ had purchased all the bonds and was now foreclosing upon the properties. R. 397–99. Obviously, Richardson clearly be-

---

14. At that hearing, I considered the Debtors' motions to (i) approve the retention of Ravin Sarasohn as their bankruptcy counsel, which I approved for the limited purpose of defending the Debtors in this motion, and (ii) approve the appointment of David Lichtenstein as the Debtors' responsible person, which I denied.

lieved that the reason for his presence, as DLJ's guardian of the properties, had been mooted because DLJ was in complete control, having installed receivers at the properties and having started to foreclose on them.

## II.

The Movants argue that each of the eleven involuntary petitions was filed in bad faith and should be dismissed pursuant to section 1112(b) of the Bankruptcy Code.[15] This conclusion is said to be warranted because Ginsberg, acting on behalf of the Debtors, initiated, funded and identified seven friendly creditors to prosecute the involuntary petitions so each Debtor could obtain improper leverage against the Movants by gaining access to the bankruptcy court without violating the bankruptcy restrictions in the bylaws of the various Debtors or their corporate general partners. The Movants point out that the filing of each petition was timed either to stay a scheduled foreclosure sale or to coincide with a particular Debtor's deadline to file an appellate pleading, which resulted, the Movants claim, in the frustration of their attempts to enforce their rights against each property. The Movants dismiss the Debtors' attempts to excuse such behavior by countering that there is no such doctrine as "justifiable collusion."

The Movants have centered their case around the Second Circuit decision, *Federal Deposit Ins. Corp. v. Cortez*, 96 F.3d 50 (2d Cir.1996), which held that, in certain circumstances, a collusive filing of a bankruptcy case is a fraud upon the jurisdiction of the Bankruptcy Court and therefore susceptible to immediate dismissal. Because the Movants believe that the *Cortez* case is controlling, they did not offer initially any evidence regarding any of the Debtors' financial situations, their equity (or lack thereof) in the properties or their ability to reorganize. In other words, the Movants are of the opinion that if I were to find that collusion did occur,

under *Cortez* I am bound to dismiss the cases. As an alternative, the Movants suggest that the facts warrant conversion of the cases to chapter 7 or appointment of a chapter 11 trustee.

The Debtors and Petitioning Creditors (collectively, the "Respondents") filed a joint post-trial brief in opposition to the Movants' motion. The Respondents deny that the Debtors colluded with the Petitioning Creditors to file, or orchestrate the filing of, these cases. While conceding that Ginsberg did facilitate the filing by supplying information to the Petitioning Creditors and advancing funds to their counsel, Pryor Cashman, the Respondents contend that Ginsberg acted in his individual capacity and that the Debtors took no action. They point out that any restriction contained in the Debtors' bylaws regarding the filing of voluntary petitions in bankruptcy did not extend to prevent Ginsberg or creditors of the Debtors from taking independent action such as filing an involuntary petition. In any event, the Respondents argue, the Petitioning Creditors hold valid claims against the Debtors, which the Movants never contested, and filed these cases for legitimate reasons on the careful advice of counsel, and only after counsel had performed extensive due diligence. The Respondents posit that seeking bankruptcy protection for the Debtors was the best and only method available to (i) preserve any chance of recovery on their claims (as well as those of the limited partners) before the Movants foreclosed on the assets of each Debtor, (ii) challenge the validity of the Movants' claims, and (iii) find a third party to fund a plan of reorganization or purchase the properties, which would result in a greater recovery to all parties than would be obtained from the pending foreclosures.

Moreover, the Respondents say, any aid Ginsberg gave to the Petitioning Creditors regarding the filing of the petitions was in response to the bankruptcy-remote provision contained in the bylaws of each entity that

---

**15.** Section 1112(b) of the Bankruptcy Code provides in pertinent part—

[O]n request of a party in interest .... and after notice and a hearing, the court may convert a

case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause....

prevented the Debtors from filing voluntary petitions in bankruptcy absent a unanimous vote by the board of directors and shareholders. · The Respondents argue that attempting to obtain such a vote, in light of their contention that the so-called independent director actually was beholden to DLJ, would have been an exercise in futility, a contention which subsequent events seem to have borne out. The Respondents emphasize that the bankruptcy remote provisions notwithstanding, the boards of directors had fiduciary obligations to creditors and limited partners which had to be carried out, even if to do so would have frustrated the mortgagee's efforts to foreclose. Finally, the Debtors claim that the alleged failure of the Movants to file deficiency motions in the state courts has left certain Debtors with unencumbered assets which could be used to fund a plan.

Both the Kingston Square Limited Partners and the Highland Montgomery Limited Partners state that because they have filed joinders in support of certain of the involuntary petitions, their acts ratify those filings and immunize the petitions from claims of bad faith or ·collusion. In addition, echoing what the Petitioning Creditors have maintained throughout these cases,· these limited partners state that parties exist with the financial means available to effectuate a joint plan or individual plans of reorganization which would produce some recovery to them that would otherwise be denied by virtue of the foreclosures the Movants are pursuing. Finally, the limited partners ask that, at a minimum, I deny the Movants' motion and appoint chapter 11 trustees because, they say, the receivers have mismanaged the properties and the Debtors' individual boards of directors have breached their fiduciary duties to the Debtors, creditors and limited partners.

## III.

### A. Dismissal of Involuntary Cases.

At first blush, these cases seem ripe for dismissal. The Debtors are single asset entities with no employees whose involuntary petitions were filed at the behest of their principal to circumvent what effectively were prohibitions on the filing of voluntary petitions. The petitions were filed while the Debtors were embroiled in a dispute with their secured creditor and were facing foreclosure. See, e.g., Matter of Little Creek Development Co., 779 F.2d 1068 (5th Cir. 1986) (citing examples in cases); In re Cohoes Indus. Terminal, Inc., 931 F.2d 222, 227 (2d Cir.1991); In re 9281 Shore Road Owners Corp., 187 B.R. 837 (E.D.N.Y.1995);. In re Con Am Grandview Assocs., L.P., 179 B.R. 29 (S.D.N.Y.1995), but see Carolin Corp. v. Miller, 886 F.2d 693, 701 (4th Cir.1989) (warning of the dangers of forcing particular facts into previously identified patterns).

As the Movants, Chase and REFG have the burden of producing evidence that there is "cause" for relief under § 1112(b). Thereafter, if that burden is met, the Debtor must show that relief is not warranted. In re Lizeric Realty Corp., 188 B.R. 499, 503 (Bankr.S.D.N.Y.1995). Although the term "cause" is not defined, section 1112(b) sets forth a list, which is not exhaustive, of ten factors that can constitute cause for dismissal or conversion. In re Gucci, 174 B.R. 401, 409 (Bankr.S.D.N.Y.1994); In re Cardi Ventures, Inc., 59 B.R. 18, 21 (Bankr.S.D.N.Y. 1985). As a result, within the boundaries of well-settled principles, a bankruptcy judge has wide discretion to determine if cause exists and how ultimately to dispose of the case.

Even though the Bankruptcy Code does not explicitly require that a chapter 11 petition be filed in good faith, many of the circuit courts have opined as to when a bankruptcy court may dismiss a voluntary chapter 11 petition at the inception of the case. See, e.g., Carolin Corp., 886 F.2d 693 (collecting cases); Little Creek Development Co., 779 F.2d at 1072 & n. 2 (collecting cases). Their theory is that if a petition is not filed in good faith, it is an abuse of judicial process or of the jurisdiction of the bankruptcy court. Carolin Corp., 886 F.2d at 699; In re Garsal Realty, Inc., 98 B.R. 140, 150 (Bankr. N.D.N.Y.1989).

■ The inquiry into whether a bankruptcy petition was filed in good faith does not change even if the petitions under scrutiny are involuntary ones. *See e.g., Federal Deposit Ins. Corp. v. Cortez,* 96 F.3d 50 (2d Cir.1996); *In re Winn,* 49 B.R. 237, 239 (Bankr.M.D.Fla.1985) (involuntary filing does not prevent court from inquiring into the presence or absence of good faith, especially to the extent of the debtor's involvement and role in the instigation of the involuntary case); *In re G–2 Realty Trust,* 6 B.R. 549, 552–53 (Bankr.D.Mass.1980) (if an involuntary petition insulated a debtor from an examination into the good faith of the filing, this would encourage collusion by a debtor seeking to fraudulently procure bankruptcy court jurisdiction).

Determining whether a petition has been filed in good faith is difficult because the very term itself, "good faith," is an amorphous notion that is largely defined by factual inquiry. *In re Laguna Assocs., L.P.,* 30 F.3d 734 (6th Cir.1994); *In re Albany Partners, Ltd.,* 749 F.2d 670 (11th Cir.1984). Because no single factor is determinative of good faith, I must examine the facts and circumstances of each case in light of several established guidelines or indicia, essentially conducting an "on-the-spot evaluation of the Debtor's financial condition [and] motives," *Laguna Assocs.,* 30 F.3d at 738; *Little Creek,* 779 F.2d at 1072 (referring to recurring patterns of conduct and facts); *In re Caldwell,* 851 F.2d 852, 860 (6th Cir.1988). It is the totality of circumstances, rather than any single factor, that will determine whether good faith exists. *Cohoes,* 931 F.2d at 227; *Garsal Realty,* 98 B.R. at 151.

■ The standard in this Circuit is that a bankruptcy petition will be dismissed if **both** objective futility of the reorganization process **and** subjective bad faith in filing the petition are found. *In re RCM Global Long Term Capital Appreciation Fund, Ltd.,* 200 B.R. 514, 520 (Bankr.S.D.N.Y.1996) (citing *Cohoes,* 931 F.2d at 227; *Gucci,* 174 B.R. at 409; *9281 Shore Road,* 187 B.R. at 855).

The Movants suggest that they do not have to meet both these tests because of the Second Circuit's recent ruling that where a debtor colludes with its creditors to seek bankruptcy protection, the ensuing bankruptcy is a fraud upon the court and must therefore be dismissed. *See Federal Deposit Ins. Corp. v. Cortez,* 96 F.3d 50 (2d Cir.1996). In other words, they argue that by virtue of the presence of collusion, the first test, looking to the case's objective futility, would be no longer relevant to my analysis. So it is to the parties' arguments that I turn.

### 1. The Movants' Case for Collusion

■ Collusion between a debtor and creditors is not a new concept in bankruptcy law, having appeared in case law since the beginning of this century. *See, e.g., Blumenthal v. Strat (In re Cohn),* 227 F. 843 (3d Cir.1915); *Cornwall Press v. Ray Long & Richard R. Smith, Inc.,* 75 F.2d 276 (2d Cir.1935). Yet these early cases did not set out factors to identify collusive bankruptcy filings.

Black's Law Dictionary defines collusion as:

> a secret combination, conspiracy, or concert of action between two or more persons for a fraudulent or deceitful purpose.

*Black's Law Dictionary* 264 (6th ed.1990); *see also In re New York Trap Rock Corp.,* 42 F.3d 747, 752 (2d Cir.1994). As this definition plainly reads, there are two components to collusion: (i) the secret acts of at least two people and (ii) the wrongful purpose. Case law from other jurisdictions recognizes this interpretation of the definition. *See e.g., In re Winn,* 49 B.R. 237, 239 (Bankr.M.D.Fla. 1985). The *Winn* court developed a two-part test to determine whether an involuntary filing should be dismissed as collusive: first, there must appear to be concerted action between the debtor and the petitioning creditors, and second, these parties must fraudulently invoke the jurisdiction of the court. 49 B.R. at 239.

As the Movants view the trial record, overwhelming evidence exists that the Debtors, through Ginsberg's acts, colluded with the Petitioning Creditors, acting through its

counsel, Pryor Cashman, to file the eleven involuntary cases. The Movants point to the following acts or groups of acts that when pieced together paint an unbecoming picture:

*a. Ginsberg hires Berlack as potential bankruptcy counsel for all thirty-eight properties.* R. 17–19.[16] Immediately thereafter, on July 19 and July 23, 1996, Ginsberg provided Edward Weisfelner with a list of possible petitioning creditors. The Movants believe it significant that Ginsberg supplied these names in the absence of creditors pressing for payment or seeking bankruptcy relief. The next step, according to the Movants, was finding suitable counsel to represent petitioning creditors.

*b. The July 25, 1996 meeting.* At the invitation of Berlack, Wolfson attended a meeting which he thought would include creditors interested in filing an involuntary petition. R. 501. Apparently unbeknownst to Wolfson, no creditor had yet agreed to sign on as a petitioning creditor although both Ginsberg and Pasternak, potential creditors, were in attendance.[17] After Weisfelner and Ginsberg filled Wolfson in on the problems that the Debtors were facing, specifically the foreclosures by the Movants and legal obstacles to filing voluntary petitions, Weisfelner recommended that involuntary petitions be filed. R. 25.

*c. Ginsberg and Pryor Cashman recruit the Petitioning Creditors.* Ginsberg had identified a number of trade creditors, including the Debtors' attorneys, as potential petitioning creditors. One of Ginsberg's subordinates called Stelco, which agreed to be a Petitioning Creditor; Pryor Cashman engaged in a letter-writing campaign attempting to interest trade creditors in joining. The campaign recruited only one trade credi-

tor, Embassy Elevator, to join Stelco. R. 570; Ex. 68. The other five Petitioning Creditors came from the battery of professionals that the Debtors employed to fight the Movants in the numerous state court actions.

Prior to their being recruited, the Petitioning Creditors had taken little, if any, action to recover on their accounts other than send invoices to the Debtors. One creditor, Eugene Miller, had written off the claim as uncollectible despite being owed $75,000. Of all the Petitioning Creditors, only Embassy Elevator, which was owed $55,170.49, had taken any legal action to enforce its rights, filing a mechanic's lien against the Bronx Debtors in 1994. Not until Ginsberg acknowledged on behalf of the Debtors the debt owed to Pasternak of $197,328.61, an act which the Movants claim was taken solely to facilitate Pasternak's becoming a petitioning creditor, did Pasternak agree to become a Petitioning Creditor. Remember, however, that Pasternak had to put his house at risk to finance the loss of income which he suffered from the Debtors' failure to pay him.

Since these cases commenced, the Petitioning Creditors have exhibited no interest in what has been transpiring.[18] And, of the seven individual creditors comprising the Petitioning Creditors, at least three had no knowledge of who was footing the bill for the legal expenses.

*d. Ginsberg pays Pryor Cashman's fees.* Originally, Ginsberg offered Wolfson the amount of $50,000 as a retainer to be secured by a wraparound mortgage. Those Petitioning Creditors who testified universally agreed that the absence of any responsibility for fees was a precondition to their joining the group. Ex. 68; Ex. 82 at 38–39; R. 128–29. Only Pasternak knew with any assured-

---

**16.** The evidence is unclear as to whether Berlack was also retained as Ginsberg's personal attorney. R. 19 (Berlack rendered services to the debtors and potential debtors); R. 23 ("Berlack rendered services to myself and the 38 entities")(quoting from Ginsberg's December 16, 1996 deposition).

**17.** As I described above, Pasternak was reluctant to be a Petitioning Creditor until he had satisfied

his own ethical concerns about an attorney being a Petitioning Creditor. After he had satisfied his concerns, he signed a number of involuntary petitions in blank to be filed as needed.

**18.** In fact, at no time did the Petitioning Creditors ever meet collectively, either telephonically or in person, with or without Pryor Cashman, to discuss anything.

ness that Ginsberg was paying Pryor Cashman's retainer.

*e. Ginsberg is the catalyst behind the filings and orchestrates the cases with Wolfson.* Ginsberg ensured that the Debtors would fail to respond to the involuntary petitions. R. 50–51; Ex. 88 at 123.[19] During the eleven week period from early September to mid-November (when the last involuntary was filed), Pryor Cashman met with Ginsberg on ten separate occasions and conducted at least 49 telephone calls with either Ginsberg or his assistant. During that same period, Pryor Cashman conducted only 12 telephone calls with the Petitioning Creditors and met only once with Pasternak.

David Lichtenstein, who was brought into these cases by Ginsberg as a potential purchaser of the Debtors' assets, testified at his deposition that Ginsberg had "definitely urged" the creditors to file, that "it was the only way to defend the estate and the only way they'd ever get paid." Ex. 91 at 127.

Taking the evidence together, the Movants argue that Ginsberg was acting on behalf of the Debtors throughout this period, not individually as a creditor. Therefore, they say, his involvement with Pryor Cashman, demonstrates the collusion between the parties.

*2. The Respondents' Denial.*

In attempting to refute the Movant's charges, the Debtors and Petitioning Creditors spend an inordinate amount of time describing what has been referred to generally as "Ginsberg's story," his written presentation of how the Debtors came to be in bankruptcy.[20] Addressing the merits (or

lack thereof) of the Movants' case, they offer the following five defenses in rebuttal: (i) any acts taken by Ginsberg were done in a private capacity as a creditor seeking to protect his own interest and not in violation of any law; (ii) Ginsberg and Pryor Cashman have no agreement regarding the filing of these cases; (iii) the filing of the involuntary petitions did not violate any law or the by-laws of the corporations; (iv) the Petitioning Creditors hold valid claims and filed the involuntary petitions in good faith; and (v) bankruptcy is in the best interests of the Debtors and their estates. In short, the Respondents would have me find that the activities surrounding the filing of the involuntary petitions were not part of some scheme to improperly gain bankruptcy jurisdiction but were motivated solely by a genuine desire to get creditors' claims paid and to preserve value for the limited partners, a possibility which would have evaporated had the foreclosures proceeded.

*a. Ginsberg was only acting for himself.* There can be little doubt that Ginsberg assisted Pryor Cashman in putting together the necessary information to prepare and file the involuntary petitions. He did more, however. He and Wolfson also discussed how the involuntary petitions could be admitted if the Debtors did not contest them, R. 50–51, and what priority to accord the filings of the various involuntary bankruptcy petitions. Ex. 88 at 98; R. 543. Ginsberg also arranged for the payment of Pryor Cashman's retainer through one of his own entities.

The Movants say Ginsberg was acting for the Debtors, the Respondents, that he had to have been acting in his individual behalf be-

---

**19.** Wolfson: "If we don't object to the filing of the petition[s], it is deemed admitted ... I think." Ginsberg: "I wouldn't think that I would want to have the debtors oppose [them]."

**20.** The "History of MLG Properties and DLJ" is essentially Ginsberg's written tale of how the Debtors and he got into their financial predicament. Ex. 113. The Debtors and Petitioning Creditors *continually refer to this exhibit for the* factual background to these cases. That is curious because I did not admit this document for the truth of the statements contained therein, R. 656–57, but solely for the limited purpose of

analyzing Wolfson's state of mind at the time he was considering taking on the representation of the Petitioning Creditors, R. 657–58. The Movants also allude to this exhibit several times but properly limit their use of this document to refuting Wolfson's contention that he believed the Debtors had a viable claim for equitable subordination against DLJ. In any event, this "story" has little relevance to the issue at hand, whether the Debtors and Petitioning Creditors colluded to file the involuntary cases. To reiterate, I am only using this exhibit for the limited purposes for which I admitted it and no more.

cause he no longer had any control of or interest in the Debtors given the Movants' earlier foreclosure of his equity interests in the Debtors.

Despite this foreclosure, Ginsberg was never removed as the general partner by any of the limited partners, although the limited partnership agreements provided a mechanism for such removal. Moreover, he was never fired as an officer or director of the general corporate partners by DLJ. Ginsberg himself believed he could still act for the Debtors. For example, he employed counsel in Florida and New Jersey to contest the foreclosure actions against the Debtors. Ginsberg consulted Berlack possibly to be the Debtors' bankruptcy counsel. He also signed Pasternak's invoice acknowledging his bill for legal services as an obligation of the Debtors. No party questioned the viability of conducting a board of directors' meeting with Ginsberg as a director, or later questioned the authenticity of such a meeting, during which Pryor Cashman presented the Petitioning Creditors' case in favor of bankruptcy protection for the Debtors to the Board. Ginsberg also arranged for the Debtors to obtain legal counsel for these cases.

The Respondents cannot have it both ways. On the one hand, they claim that Ginsberg was acting in a private capacity. Yet, on the other, they argue that, as a member of the board of directors, Ginsberg had fiduciary duties not only to shareholders but to unsecured creditors and limited partners as well. *Respondents' Post-trial Brief,* p. 37 n. 7. If he was carrying out his fiduciary responsibilities, then he wasn't acting in a "private capacity" as a creditor. In any event, the Respondents fail to point to anything in the record indicating that Ginsberg ever acted as a creditor of the Debtors or behaved in an individual capacity. At most, he speculated at times that the Debtors might owe him money for paying the consultant fees for Berlack and the retainer for Pryor Cashman, *Ex.* 88 at 76–77, 82–83, but the repayment of such monies was not his main concern, salvaging something from the

properties was. Overall, I find that the Movants have the better of the argument, that Ginsberg was acting for the Debtors and not as a creditor or in some ill-defined individual capacity.

*b. Whether Ginsberg and Pryor Cashman had any agreement relating to the filing of these cases.* After the initial meeting of July 25 with Ginsberg and his battery of counsel, Wolfson commenced his due diligence regarding the MLG I and II transactions. But, amazingly enough, Pryor Cashman did not appear to have a client on whose behalf it was conducting such an investigation. Wolfson testified as to a lengthy process he conducted instituted to drum up support among creditors to sign involuntary petitions. Originally, he had expected Ginsberg, Arthur Israel or Pasternak to become a Petitioning Creditor and also pay Pryor Cashman's retainer. But the only parties he could convince to join as Petitioning Creditors besides three law firms, Pasternak, Kennedy and Peri & Stewart, were Trauben, the appraiser, and Miller, a real estate consultant, both of whom had long been colleagues of Ginsberg and had not taken action to collect on their bills. Only two trade creditors, Stelco and Embassy Elevator, joined the petitions. Ginsberg advanced $75,000 to Pryor Cashman as an initial retainer. Although Pryor Cashman had frequent communications with Ginsberg, there is no evidence that Pryor Cashman ever met with the Petitioning Creditors as a group either in person or by conference telephone call; in fact, communication between Pryor Cashman and the Petitioning Creditors was minimal during this period. Without any doubt, Ginsberg and Pryor Cashman have a cozier relationship than what should be expected normally between alleged debtors and attorneys for petitioning creditors.

To refute the Movants' charge that Pryor Cashman and Ginsberg were acting in concert, Wolfson testified that he and Ginsberg did not always see eye-to-eye regarding how to proceed in these cases. He described two specific instances where his suggested course of action ran counter to Ginsberg's personal agenda. On one occasion, in either late Octo-

ber or early November 1996, Wolfson referred a principal of Affirmative Equities, a party who, together with CS First Boston, was interested in arranging a consensual deal with all the parties, to meet with Ginsberg. The meeting did not go well; Affirmative sought guidance from Wolfson as to how to proceed. Wolfson testified that he advised Affirmative to take its proposal directly to DLJ, which perturbed Ginsberg since he believed that all deals should be run by him. R. 583.

On the second occasion, presumably after the first series of petitions was filed, Ginsberg demanded that Wolfson quickly file an equitable subordination complaint to pressure DLJ to negotiate. Wolfson refused, advising Ginsberg that it was more appropriate for the Debtors or court-appointed trustee to commence and pursue the suit, and that "until and unless you become one of my clients ... don't tell me what to do." R. 583–84.

Whereas Wolfson may not have exhibited complete fidelity to Ginsberg's wishes, it is clear that the two frequently spoke to coordinate the filing of the uncontested petitions, which would seriatim stay the most threatening of the foreclosure proceedings. R. 50–51; 542–44; Ex. 88 at 123. This is not to say that all cooperation with creditors wishing to file an involuntary petition is problematic. Indeed, case law permits a debtor's insider to cooperate with creditors to facilitate the filing of an involuntary case in appropriate circumstances. The Respondents suggest that Ginsberg's behavior corresponds to that of the debtor in *In re Sky Group Int'l, Inc.*, 108 B.R. 86 (Bankr.W.D.Pa.1989). In that case, after inquiring of the debtor as to why his bills were not being paid, a creditor learned that the debtor was having a cash flow problem and that if a pending foreclosure were permitted to proceed, creditors would receive nothing. The creditor requested the debtor to provide him with a list of creditors, which the debtor produced. Shortly thereafter, this creditor together with others filed an involuntary chapter 7 petition against Sky Group, thereby delaying the foreclosure sale. Later, the bankruptcy court ruled that the debtor's providing the creditor with the information about its current financial difficulties and a list of creditors did not lead to the inference that the "filing of the petition was the result of a scheme or contrivance." *Id.* at 90.

Notably, the bankruptcy judge in *Sky Group* looked at the facts from the Debtors' worst perspective. *Id.* Doing so here, it appears that after exhausting his state court remedies, as evidenced by the entry of numerous judgments of foreclosure, Ginsberg informed the Debtors' attorneys, appraiser, and real estate consultant of the Debtors' dire financial straits and his desire to salvage something for the equity interests. Few of these parties were willing to commit to the bankruptcy filing. One of the attorneys, Pasternak, who was truly suffering from the Debtors' failure to pay his debt, did agree, but only after receiving written confirmation from Ginsberg attesting to the validity of what is by far the largest unsecured claim in these cases. Despite the best efforts of Ginsberg and Pryor Cashman, only two trade creditors could be convinced to join the professionals in filing the involuntary petitions. Ginsberg ensured that the participation of the Petitioning Creditors by paying Pryor Cashman's initial retainer and expenses. Shortly thereafter, Ginsberg arranged for the retention of bankruptcy counsel for the Debtors and for payment of that firm's retainer as well. It is ridiculous on these facts to insist that Ginsberg and Pryor Cashman had no agreement. Their agreement was that in return for Ginsberg's advancing of Pryor Cashman's fees, the firm would file involuntary petitions to stay the foreclosure proceedings, and perhaps, permit reorganization.

*c. The involuntary petitions did not violate any laws or the corporate bylaws.* I agree with the Respondents that a bankruptcy proof provision in a corporate bylaw does not prevent outside creditors from banding together to file an involuntary petition. As they correctly argue, neither the corporate nor partnership documents establish a bar to prevent any party connected with the Debt-

ors from acting on its own to file involuntary petitions. In support, the Respondents rely on *In re Spanish Cay Co., Ltd.,* 161 B.R. 715 (Bankr.S.D.Fla.1993), which involved a Bahamian corporation whose principal asset was an island located in the Bahamas that it intended to develop into a resort. Three insiders filed an involuntary petition against the partnership when the venture faltered. The debtor's secured creditor, Canadian Imperial Bank of Commerce ("CIBC"), filed a motion to dismiss the case claiming, among other things, that the involuntary filing was in bad faith because the petitioning creditors had assigned their claims to CIBC pursuant to an assignment that became effective upon the filing of a bankruptcy petition. The court denied the motion to dismiss although it did cite its concern with the insiders' strategy to commence the case by filing involuntary petitions. Nonetheless, the court found that this procedure was not fatal to the filing because the insiders appeared to be motivated in part by the board's ability to reach a consensus on filing bankruptcy. *Id.* at 723. The court also noted that this lack of consensus itself would not establish a basis for dismissing an involuntary petition brought by insiders as a bad faith filing. *Id.* at n. 8.

The Movants argue that *Spanish Cay* is inapposite because it is not a collusion case and was a case about the validity of the claims that the petitioning creditors held. The refrain to their song is that Ginsberg orchestrated these filings with the Petitioning Creditors to avoid the restrictions of the corporate bylaws that the directors and shareholders had to unanimously vote in favor of a voluntary petition. But what occurred in *Spanish Cay* is no different from what happened in these cases—Ginsberg perceived that the boards would not or could not authorize the Debtors to obtain the relief most appropriate to their situations, chapter 11 protection, so another route had to be taken, one which was not prohibited by the corporate documents or statute.

The Respondents also rely a recent decision of this court, *In re American Globus Corp.,* 195 B.R. 263 (Bankr.S.D.N.Y.1996),

for the proposition that a petition should not be dismissed, although it was filed without the requisite corporate authority, because to do so would prefer form (in the nature of preserving corporate formalities) over substance (the economic realities which militate in favor of bankruptcy). *Id.* at 266. In *American Globus,* the debtor's bylaws contained a voting requirement that all corporate action be approved by a unanimous vote of the shareholders, of which there were two. One shareholder, holding 70% of the debtor's stock, determined to file for chapter 11 protection without obtaining the approval of the other shareholder holding the remaining 30%. I held that the dissenting shareholder, who himself had been guilty of long ignoring corporate formalities, was estopped from using such an argument against the other shareholder, especially in light of the fact that the request for dismissal of the case was motivated by the shareholder's desire to avoid having his acts scrutinized by a bankruptcy trustee.

The Movants assert that the Respondents are using this case improperly to establish the proposition that corporate action routinely can be taken in contravention of bylaws that require unanimity among shareholders or directors. The Movants believe that the Respondents (actually Ginsberg) should be similarly estopped because of their failure to follow corporate formalities. However, as I described above and will return to shortly, Laurence Richardson was also a director of the Debtors' corporate general partners, and a designee of DLJ, who also did little to exercise his proper corporate role, largely ignoring the precepts of fiduciary duty and corporate loyalty.

A recent case from the Southern District, *Management Technologies, Inc. v. Morris,* 961 F.Supp. 640 (S.D.N.Y.1997), decided after the trial in this case, is of particular relevance to this proceeding. There, a publicly-traded New York corporation with substantial holdings and operations in the United Kingdom had been suffering a financial crisis for at least two years. This financial turmoil led to corporate upheaval, including significant turnover in management. This

also led to a failure in following corporate formalities; the parent company ("MTI") created a position of chief executive officer to attempt to rehabilitate the corporate family without amending the corporate bylaws to provide for the creation of such a position. In responding to the developing financial crisis, the four member board of directors was split as to how to proceed. Michael J. Edison, chief executive officer and a director of MTI, perceived that the United Kingdom subsidiaries faced liquidation and that MTI's very existence was in jeopardy because of the board's inability to act. In order to break this deadlock, Edison, acting in his capacity as chief executive officer, adopted new articles of association for MTI which empowered him to dismiss the other directors and appoint himself sole director. He took identical actions for the two subsidiaries. Now in charge of the UK subsidiaries, Edison adopted written resolutions putting the two companies into administration, a roughly comparable proceeding to a chapter 11 reorganization case.

Edison then caused MTI to commence an action in New York state court to discharge its directors for cause. The directors removed the action to the federal court and filed opposition contesting Edison's authority to have discharged the directors and put the subsidiaries into administration. After reviewing the evidence, the court found that there were two critical, undisputed points regarding the controversy. First, MTI and its affiliates were all in serious financial straits. Second, the board was deadlocked between two hostile factions as to what actions ought to be taken to stave off financial ruin. The court confirmed Edison's actions as a proper exercise of authority because "the defendant board members ... had been guilty of breaches of loyalty to the company.... Assuming that the threat posed by creditors was ... grave ... Edison ... had the power to take such steps as were necessary to place the UK subsidiaries in administration proceedings in order to preserve MTI's assets for the benefit of its creditors and shareholders."

This case supports the Respondents' position that corporate action taken by an insider without board or shareholder authority may later be found to have been appropriate in circumstances where the existence of the corporation is very much at risk. Here, with foreclosures being instituted by the Movants against each Debtors' property and the Debtors' board stymied in filing for bankruptcy in light of the blocking vote held by Richardson, Ginsberg's acts to garner support from willing creditors to file involuntary cases in order to thwart financial ruin would appear to be right in line with *MTI* as well as *Spanish Cay*.

*d. The Petitioning Creditors hold valid claims.* While I agree that no credible evidence has been offered to dispel the *prima facie* validity of the claims held by the Petitioning Creditors, that fact is not equivalent to finding that there is no subjective bad faith in filing the bankruptcy petitions. *In re Winn,* 49 B.R. 237, 239 (Bankr.M.D.Fla. 1985). A court must still inquire into the surrounding circumstances to determine if the jurisdiction of the court has been fraudulently invoked. *F.D.I.C. v. Cortez,* 96 F.3d 50, 51 (2d Cir.1996). In other words, although the existence of seemingly valid claims is suggestive that the involuntary petitions do have some basis, it is not dispositive.

Whether the Petitioning Creditors were pressing for payment of their claims or had even sent the Debtors a statement of account is irrelevant to the issue of whether they hold valid claims. *In re Manchester Lakes Assocs.,* 47 B.R. 798, 801 (Bankr.E.D.Va.1985) (failure of parties to make demand for payment unnecessary where debts have been shown to be outstanding more than 30 days); *In re Rimell,* 111 B.R. 250, 253 (Bankr. E.D.Mo.1990) (party's failure to send a bill to debtor is of little consequence to status as creditor), *aff'd,* 121 B.R. 253 (E.D.Mo.1990), *aff'd,* 946 F.2d 1363 (8th Cir.1991).

*e. Best interests of the estate.* The Respondents' fifth defense, whether bankruptcy is in the best interests of the Debtors and their estates, is not relevant to the first inquiry, whether the filing of the petitions

was procured by the Debtors. I will address that issue later in this opinion.

Based on the facts as adduced, I conclude that the Respondents did in fact orchestrate the filing of these involuntary cases. I now turn to the question of whether in so doing they fraudulently invoked the jurisdiction of this court.

Earlier this century, collusion was charged where a party, in financial difficulties, tried to file for bankruptcy protection under the old Bankruptcy Act [21] by "admitting" to its creditors that it was unable to pay its debts and subsequently arranging with the creditors to file an involuntary proceeding. *See, e.g., Cornwall Press v. Ray Long & Richard R. Smith, Inc.,* 75 F.2d 276 (2d Cir.1935); *Blumenthal v. Strat (In re Cohn),* 227 F. 843 (3d Cir.1915) (in both cases the "bankrupt" signed a written admission that it was unable to pay its bills).

In *Cornwall,* the circuit court stated that "if opposing creditors to a petition in involuntary bankruptcy could prove that the written admission thereof was the result of fraud and collusion between the debtor and certain creditors, or in the aid of a collusive scheme, an order of adjudication would not be entered." *Cornwall,* 75 F.2d at 276–77 (quoting *Blumenthal v. Strat* ). Because the bankruptcy court is a court of equity it will not participate in fraud and "may refuse to ... grant an adjudication ... where to do so would be a fraud upon the act." *Cornwall,* 75 F.2d at 277. Other courts held that if the "commission of a fraud on the court [is] established, the petition should be dismissed....." *In re National Motorship Corp.,* 7 F.Supp. 1001 (S.D.N.Y.1934); *see In re Syracuse Stutz Co.,* 55 F.2d 914, 916 (2d Cir.1932); *In re Goldman–Rosenzweig Co.,* 65 F.2d 390 (2d Cir.1933).

Seizing on this base and two recent decisions, the Movants argue that collusion constitutes cause by itself mandating the dismissal of offending involuntary bankruptcy petitions. *See Federal Deposit Ins. Corp. v.*

*Cortez,* 96 F.3d 50 (2d Cir.1996) (involuntary proceeding brought by the debtor's stepfather); *In re Winn,* 49 B.R. 237 (Bankr. M.D.Fla.1985) (involuntary petition prepared by the debtor and filed by debtor's attorney and two personal friends). My independent research has located a third case with similar facts. *In re Corto,* 1995 WL 643372, Nos. 93–CV–0175E(H), 93–CV–0176E(H) and 93–CV–0340E(H) (W.D.N.Y. Oct. 18, 1995) (petitioning creditors were debtor's mother and son), *aff'd,* 112 F.3d 503 (1997).

In *Cortez,* Nellie Cortez had filed a voluntary bankruptcy case in the Southern District of Florida bankruptcy court in 1990. In June 1992, that court dismissed her case with prejudice to the filing of a petition under any chapter of the Bankruptcy Code for a period of 12 months. Two months later, Cortez' stepfather, who had acted as her attorney-in-fact in the Florida case, brought an involuntary case against Cortez in California. Cortez did not contest the filing. Later, the FDIC sued Cortez in New York to collect on promissory notes which she had executed in favor of a bank for which the FDIC was the receiver. Cortez argued to the New York court that her California bankruptcy case stayed the New York action.

Both the district court and, on appeal, the Second Circuit, disagreed, finding that Cortez and her stepfather had colluded to arrange the involuntary filing in order to avoid the decree of the Florida court. Their behavior was a fraud on the court because it indirectly accomplished what the bankruptcy court had ordered impermissible, and therefore, the bankruptcy filing in California was decreed ineffective to stay the FDIC's action.

*Cortez* relied heavily on *Winn.* There, Newton Alfred Winn, a practicing attorney, filed a voluntary bankruptcy case to stay the enforcement by School Pictures of Mississippi, Inc. of contempt proceedings against him. The court granted School Picture's motion, finding that the case was filed solely to escape the consequences of the contempt judgment and not to rehabilitate Winn under

---

**21.** Under the Bankruptcy Act of 1898, the requirements for filing a bankruptcy petition were

more stringent than those of the current Bankruptcy Code.

chapter 11. Within two months after the dismissal, Winn was back in bankruptcy court, the subject of an involuntary filing by four individual creditors who were all personal friends of the alleged debtor. After Winn consented to entry of an order for relief, School Pictures filed a new motion to dismiss.

At trial, the court found that the petitioning creditors held legitimate claims against Winn and that they had signed the involuntary petition and supporting papers (which Winn himself had apparently prepared) at Winn's request. The court held that the involuntary petition had been filed in bad faith because the petition was conceived by Winn, not by his creditors, as his own last desperate effort to get back under bankruptcy protection solely to frustrate School Pictures' attempt to collect its judgment. The court noted that Winn did not file schedules timely nor did he file a plan within his exclusive period to do so or seek to extend that period. Interestingly, the court found that there was no actual collusion between the petitioning creditors and Winn.

In *Corto*, the debtor's chapter 13 case had been dismissed for her failure to prosecute it. As a result, she could not file another case for 180 days pursuant to 11 U.S.C. § 109(g). Within 100 days of that dismissal, Corto's mother and son together with a third party filed an involuntary chapter 7 case against her. After hearing evidence from one creditor, National Scenery Studios, with whom Corto had a longstanding dispute, on its motion to dismiss the case because of Corto's ineligibility to be a debtor, the bankruptcy court dismissed the case. On appeal, the district court affirmed, finding that Corto and the petitioning creditors had filed the case collusively in order to circumvent the order dismissing the chapter 13 petition and frustrate the efforts of National Scenery Studios to pursue its claim.

In each of these cases, a debtor attempted to bypass a statutory or court-imposed restriction on filing a new bankruptcy case by arranging the filings of involuntary cases with friendly creditors. Consonant with the definition of collusion, these cases contain (i) secret acts and (ii) a fraudulent purpose. The Movants ask me to extrapolate a rule from these cases that a debtor-induced filing *per se* leads to a finding of bad faith, which in turn constitutes cause for dismissing these chapter 11 cases. I decline to announce so broad a rule.

In two of the modern collusion cases, *Cortez* and *Corto*, besides dismissing the debtor's previous voluntary filings, the orders of dismissal had put severe limitations on the particular debtor's right to seek bankruptcy protection again. *Cortez*, 96 F.3d 50 (order dismissing case prohibited debtor from filing a bankruptcy petition in any court for 12 months); *Corto*, 1995 WL 643372 at *4 (debtor was prohibited by statute from refiling for 180 days). In *Cortez*, *Corto*, and *Winn*, each debtor sought to **reinvoke** bankruptcy jurisdiction under the guise of having an involuntary petition filed against them by friendly creditors after their previous bankruptcy cases had been dismissed. In *Cortez*, the debtor's action in attempting to obtain protection was arguably an act of contempt as well as fraud, since the Florida bankruptcy court had enjoined her for 12 months not to file another petition. The bottom line for all three cases is that a debtor attempted to accomplish indirectly by means of collusive, involuntary filings what each was unable to accomplish directly with a voluntary petition—maintain a bankruptcy case in the face of a previous court order dismissing their original cases for bad faith.

I do not read these cases to hold that simply because a debtor induces a creditor to file an involuntary petition, that this alone is grounds for immediate dismissal. In each of the three cases, the courts did find that each debtor had arranged with friendly creditors to file involuntary petitions against him or her. However, there was more than this concerted action that persuaded the courts to dismiss these cases, namely, the "involuntary" debtor's attempt to gain entry into the bankruptcy court for a **second** time in contravention of a previous court order or statute denying him or her the right to proceed in bankruptcy.[22]

---

**22.** While *Cortez* employs dismissal of the case as the remedy for a bad faith filing, I do not take

*Cortez* does not change the rule for this Circuit which I earlier identified, that is, that a bankruptcy petition will be dismissed if both objective futility of the reorganization process **and** subjective bad faith in filing the petition are found. *RCM Global,* 200 B.R. at 520. I do not dispute that orchestration is suggestive of bad faith, but standing alone as it does here, it is not sufficient grounds for dismissal. The Movants have failed to demonstrate that the Respondents' coordination of efforts to file these cases constitutes a fraudulent or deceitful purpose. Their actions were not a way to avoid a court order or statutory bar. Rather, the filing of these cases was undertaken to prevent the Movants from continuing on their path of foreclosure which threatened to wipe out the claims of the Debtors' unsecured creditors and the interests of its limited partners. In fact, if the values contained in Trauben's appraisal, the only valuation of the properties in evidence, is later found to be correct, equity may exist in the properties as a group despite the Movants' substantial judgments against the properties. This appraisal suggests that the Respondents had a reasonable belief that they could reorganize, which, in turn, suggests that they were not acting in bad faith when they coordinated the filing of the bankruptcy petitions. In short, the Respondents' behavior is not egregious like that found in *Winn, Corto,* and *Cortez,* outrageous attempts to avoid a court order denying each of them the right to exercise bankruptcy jurisdiction. And as I will elaborate in a moment, the behavior of the Movants certainly offers mitigating circumstances.

Just as the modern collusion cases are distinguishable, so, too, is an older one, *Shapiro v. Wilgus,* 287 U.S. 348, 53 S.Ct. 142, 77 L.Ed. 355 (1932), upon which the Movants rely. In that case, Herbert P. Robinson, operating a lumber business as a sole proprietor, fell behind in his debts. He believed that putting his business into receivership would keep creditors at bay and ultimately

lead to the business showing a profit of $100,000. Unfortunately for Robinson, Pennsylvania law did not permit sole proprietorships to be in receivership. To get around this obstacle, Robinson transferred his assets to a newly-formed corporation, and within three days had persuaded a friendly creditor to sue the corporation and obtain the installation of a receiver to safeguard assets. Two creditors objected to this action, claiming that the conveyance and ensuing receivership were part of a single scheme to hamper creditors from pursuing their remedies. Reversing the lower courts, the Court agreed with these creditors, finding that the transfer by Robinson of his assets to the corporation was fraudulent as to his creditors. As a result, the receivership itself had no vitality and had to be dissolved. *See also, In re G–2 Realty Trust,* 6 B.R. 549 (Bankr.D.Mass.1980) (modern case in which court dismisses petition as bad faith filing where debtor transformed itself from nominee trust to business trust solely to meet Bankruptcy Code's eligibility requirements). In both these cases, parties ineligible for relief transmogrified themselves in order to attempt to secure the relief for which they were ineligible. But our Debtors are not fundamentally ineligible for bankruptcy relief. That is, they meet the definition of who can be a debtor, albeit that their boards of directors must act responsibly and file voluntary petitions when warranted if they are to obtain that relief directly. The Movants suggest that *Wilgus* stands for the proposition that even a pure motive for an orchestrated filing is not sufficient to breathe life into the bankruptcy. However, the Bankruptcy Court found no such pure motive but, instead, a fraudulent transformation into a corporation in order to obtain relief not otherwise available under law.

Not only are the Debtors eligible for relief, but no court order restricting the Debtors' access to bankruptcy has been violated, and the Petitioning Creditors appear to hold colorable claims against the Debtors. The worst that the Movants have established is

that case to preordain that dismissal is always the appropriate remedy. Other forms of relief, e.g., removal of the debtor from possession by

appointing a trustee, may be more appropriate in a particular case.

that the Respondents coordinated their efforts to perform an end run around the by-law provision that restricted the Debtors from filing voluntary petitions. I do not find that, standing alone, to constitute a fraudulent intent vis-à-vis the court's process.

The recent decision of the Second Circuit in *C–TC 9th Ave. Partnership v. Norton Co. (In re C–TC 9th Ave. Partnership)*, 113 F.3d 1304 (2d Cir.1997) compels no different conclusion for there, too, the debtor, being in dissolution, was ineligible for the relief it sought. The court also affirmed the lower court's alternative ground for dismissal, that the petition had been filed in bad faith. *Id.* at 1312. On this issue, the circuit court held that, where the bankruptcy court had found that the debtor enjoyed no possibility of rehabilitation and only intended to liquidate and relitigate matters in the bankruptcy court which had been previously settled in state court litigation, good faith was lacking. *Id.* at 1310.

Here, the Debtors are eligible for relief and have sought to reorganize, not liquidate. Whether the Debtors can actually reorganize themselves is not possible to say at this time because no record has been made relative to the objective futility of reorganization. I do note, however, that third parties appear to exist who are interested in purchasing or investing in the Debtors' assets and in negotiating consensual plans of reorganization.

*3. Mitigating Circumstances in Favor of the Respondents*

I cannot overlook the lack of observance of corporate formalities by the parties in these cases. As each director, Kazarnovsky, Ginsberg and Richardson, has testified, no meetings were held after the closing of the MLG I

and II restructurings. As a matter of fact, the directors had minimal communication with each other, either by telephone or by letter, until the instant motion was filed. No financial reports were circulated; no reports or updates on the legal proceedings were distributed either by counsel or by Ginsberg, as president, to the other directors. Because both Kazarnovsky and Ginsberg believed that Richardson was DLJ's agent on the board, they purposely ignored him.[23] Significantly, the boards took no action in the face of foreclosure actions being commenced or receivers being installed.

Although Richardson learned in 1995 that the properties were being foreclosed, R. 341, he did nothing, failing even to seek any information from anyone as to what was happening. R. 345–46. Richardson says he was unaware in his capacity as director of his fiduciary duties to creditors and that he only learned of his duties to creditors later. R. 348. Basic hornbook law provides that directors occupy a fiduciary relation to the corporation and its shareholders, but the relation ordinarily does not extend to its general creditors. *3 Fletcher Cyclopedia Corporations* § 849 (M. Wolf. perm. ed. 1975). Nonetheless, it is universally agreed that when a corporation approaches insolvency or actually becomes insolvent, directors' fiduciary duties expand to include general creditors. Nearly all states' law is in accord, including those states in which the Debtors or their corporate general partners are incorporated.[24] But Richardson's claim of ignorance as to the limited partners, who are plainly analogous to stockholders, proves too much to credit. Richardson is an attorney who worked on sophisticated corporate financings. It is inconceivable that he would not understand that the corporate general partners of which he was a director bore fiduciary obli-

---

**23.** Kazarnovsky stated that he believed that following the procedures to attempt to authorize a bankruptcy proceeding would be a "futile action." R. 295–98, 309.

**24.** The Debtors or their corporate general partners are incorporated in the following states: New York, Florida, New Jersey and Delaware. Exs. 8–15. Each of these states holds that in the event of corporate insolvency, a director has a

fiduciary duty to creditors: (i) New York: *Clarkson Co. Ltd. v. Shaheen*, 660 F.2d 506, 512 (2d Cir.1981); (ii) Florida: *Tampa Waterworks Co. v. Wood*, 97 Fla. 493, 121 So. 789 (1929); (iii) New Jersey: *Francis v. United Jersey Bank*, 87 N.J. 15, 432 A.2d 814, 824 (1981); (iv) Delaware: *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784 (Del. Ch.1992).

gations to the limited partners. (That is the stuff of a basic corporate law course in law school.) Yet he completely ignored the limited partners' plight in the face of foreclosure actions instituted by the group which placed him on the boards of directors of these and other companies and saw to it that he was paid fees, even though the consequence of foreclosure would be not to simply injure but to eliminate the limited partners' interests. Richardson's failure to carry out his fiduciary role to the creditors and the limited partners was exemplified by his failure to ratify the involuntary filings during the December 1996 board meeting. If he was the "independent" director, it was in name only. Indeed, he called DLJ to inquire about whether he ought to resign once DLJ had acquired Ginsberg's interests. In other words, he seems to have perceived his mandate as accomplished—DLJ was in control without any bankruptcy by Ginsberg.

As Kazarnovsky recalled, although Ginsberg concluded that bankruptcy was the only alternative for thwarting the foreclosures, after considering the matter, he decided to forego convening a board meeting to discuss this option for two reasons. First, he felt it would be futile because Richardson, as DLJ's designee, would never approve the idea. R. 311. Second, by this time, DLJ had foreclosed upon Ginsberg's equity interests and was essentially the shareholder of each Debtor. R. 310–11. He surmised that it would be highly unlikely that any petitions would be filed because, even if Richardson authorized the petitions, DLJ would not. So when the opportunity arose to test how Richardson would react when presented with the question of voting on the issue of authorizing the filing of a bankruptcy petition, Ginsberg declined to seize it and instead circumvented the corporate approval process by orchestrating the filing of these cases with the Petitioning Creditors. Whereas I cannot condone his ignoring corporate formalities, neither can I say that, standing alone, his conduct warrants dismissal of the petitions given the factual scenario.

The Movants continually attack Ginsberg for all the ills of these cases. It is not appropriate for me to rule now on the myriad allegations about Ginsberg's dishonesty, mismanagement and the other horribles alluded to in the various court papers. All I know is that in the face of such behavior, the Debtors and limited partners continued to keep him on as chairman of the board and president of the Debtors, and the Movants accepted his presence without taking any action against him other than to slowly and inexorably close in on each property, notwithstanding that they say they acquired his equity interests and thereby the ability to oust him. In the meantime, the Movants ignore the fact that DLJ acts as lender and shareholder, while dominating the activities of the Debtors to the extent that its board designee, who was supposed to be "independent," abdicated his fiduciary role to the Debtors, creditors and limited partners in favor of the interests of DLJ.

While I find that the Respondents did orchestrate the filing of these cases, I conclude that their intention was to circumvent the inability of the Debtors to act in the face of the pending foreclosure proceedings by taking some action to preserve value for the Debtors' estates and creditors. I cannot find, as the Movants desire, that the petitions were filed solely to delay or frustrate the Movants' remedies for it is also undisputed that the Petitioning Creditors have introduced at least one third party, and as many as two others, to make proposals to purchase the properties as a package. The Movants may feel bruised because the Respondents outmaneuvered what the Movants thought was an iron-clad provision in the corporate by-laws preventing a bankruptcy filing, but this does not mean that, without more, the petitions must be dismissed.

I have previously held in another context that bad faith will not normally be found where the primary motivation of petitioning creditors was to prevent further dissipation of assets through foreclosure in an attempt to facilitate an orderly workout among all the creditors. *In re Reveley,* 148 B.R. 398, 408 (Bankr.S.D.N.Y.1992). The fact that at least

one third party has been brought forward early in this proceeding by the Petitioning Creditors certainly helps to establish that their intentions were not simply to stave off foreclosure at the last second and harass the Movants. *See e.g.*, *In re Carolin Corp.*, 886 F.2d at 704 (a last ditch effort to forestall imminent financial collapse furthers the purposes of chapter 11 if it ultimately facilitates the emergence of new investors offering an infusion of capital).

Thus, for all the of the reasons just explained, I do not conclude that the Movants have proven that these cases were collusively filed.

Section 1112(b) requires consideration of what is in the best interests of creditors and the estates. On the record thus far developed I can draw no conclusion as to whether dismissal is in the parties' best interest. It appears that the only parties who would benefit from dismissal are the Movants, while unsecured creditors and limited partners would be left with nothing if the foreclosures were allowed to continue apace. Accordingly, I find that although the filings of the involuntary petitions were solicited at the behest of Ginsberg, they are an apparent attempt to salvage some value for these estates in the face of the pending foreclosures which would have wiped out the opportunity for anyone other than the Movants to recover anything.

## B. Bankruptcy Remote Provision

Because I have not found that the Debtors and the Petitioning Creditors acted collusively in filing these cases, I need not reach the merits of the Respondents' position request that I nullify the bylaw provision containing the bankruptcy proof provision as void against public policy. In any event, given that none of the Debtors observed corporate formalities and did not prior to the involuntary filings test the directors' mettle by calling a board of directors' meeting to ascertain whether bankruptcy would be authorized, I do not believe that the issue of validity of the bankruptcy proof provision is properly before me.

## C. Issues of New York State Law

The Debtors claimed in their initial response to the Movants' motion to dismiss that under New York law the Movants are now precluded from further efforts to foreclose on the remaining properties in MLG I because they failed to follow the procedures to obtain deficiency judgments. If their theory is correct, the Debtors argue, equity for the estates would be created because the foreclosure judgment would be extinguished. I need not reach this issue now because it goes to the question of whether the Debtors have the financial wherewithal to be rehabilitated, the second prong of the § 1112(b) analysis. Because the evidentiary hearing was restricted to the issue of collusion, we will leave that issue for another day.

## Conclusion

The facts presented by these cases are quite troubling. The Debtors and the Petitioning Creditors orchestrated the filing of these involuntary cases to evade what they perceived to be an insurmountable restriction against the Debtors' filing voluntary petitions. The third director has engaged in transparent stalling tactics, the effect of which is to endanger the interests of all parties other than DLJ. Allegations circulate on the periphery that Ginsberg or his subordinates may have acted improperly in managing the properties.

Because of those concerns about Ginsberg and his asserted poor history of performing on a number of other real estate loan transactions, DLJ felt justified in structuring the two loans with Ginsberg to guarantee that it could avoid a bankruptcy filing and move to foreclose on the properties swiftly in case of default regardless of whether the default was based on lack of payment or performance. DLJ thereby put itself in the awkward position of financing the original restructuring transactions, then later assuming obligations toward the creditors and limited partners by acquiring Ginsberg's equity interests, while simultaneously pursuing and enforcing state court judgment rights (through the Movants) in order to minimize its loss on the original

bonds it repurchased. As a result, DLJ essentially held veto power over the acts the Debtors could take and found itself walking a tightrope between looking out for its own interests and breaching its fiduciary duties. This is too fine a line to comfortably navigate.

Moreover, I am also concerned that the properties have been allowed to languish at a "mere survival level" while in receivership, Movants' Motion to Dismiss at ¶ 33, without the Movants seeking to do anything except let the foreclosure process run its course. The record does not indicate that either DLJ or the Movants are expending much effort to sell the properties or authorize the expenditure of any more funds than the barest minimum necessary for upkeep (which could arguably make the properties more saleable). The parties have not agreed to a sale of the properties with a later determination of who is entitled to the proceeds. Of utmost concern to me is the fact that no one, the Movants, the Debtors, or the Petitioning Creditors, has even acknowledged the existence of thousands of residents living in these buildings, some of which have indisputably fallen into disrepair. The blame for this sorry state of affairs has to be shared by the Debtors and the Movants.

Before the evidentiary hearings for this motion commenced, the Debtors observed that these cases cry out for a new perspective.[25] I agree. During the December 5, 1996 hearing on that motion I hinted strongly to all the parties that I was inclined to grant the alternative relief the Movants were seeking by appointing chapter 11 trustees. I reiterated that belief to the parties' counsel at the close of the first day of hearings on the instant motion. R. 171–73. Nothing presented, either in oral argument or in the evidentiary record, dissuades me from my belief that there will be anything but a prophylactic effect for these estates by having chapter 11 trustees installed. Even if the Movants had not sought such relief, I

had considered taking matters into my own hand as the statute allows me. 11 U.S.C. § 1104; *In re Bibo, Inc.*, 76 F.3d 256 (9th Cir.1996) (affirming bankruptcy court's *sua sponte* appointment of chapter 11 trustee), *cert. denied,* —— U.S. ——, 117 S.Ct. 69, 136 L.Ed.2d 29 (1996); *In re Bellevue Place Assocs.*, 171 B.R. 615 (Bankr.N.D.Ill.1994) (appointment of trustee appropriate where management agreement deprived debtor of opportunity to discharge fiduciary duties); *In re Rivermeadows Assocs.*, 185 B.R. 615, 617 (Bankr.D.Wyo.1995).

DLJ is on all sides of these cases and, because of its apparent animus towards Ginsberg, is unable or unwilling to protect interests of others to whom it has assumed obligations. Richardson has refused to authorize chapter 11 reorganization and, through the split in its membership, the boards of directors are incapable of acting. Ginsberg is content to leave the properties in the hands of receivers, having little apparent interest in how they are being operated. Under such circumstances, appointment of a chapter 11 trustee is the only reasonable alternative to ensure that the limited partners and creditors are protected, that the properties are not allowed to deteriorate and that Ginsberg and those creditors who are "friendly" do not stand as an impediment to what is best for these estates. As a side benefit, that relief may moot the need for an expensive trial on reorganization prospects because the trustee will have to consider possible alternatives (including dismissal, if reorganization is seen as impossible) in any event. Therefore, I am directing the Office of the United States Trustee to appoint a chapter 11 trustee or trustees for these estates. The request of Highland Limited Partners for the appointment of a separate trustee is denied as premature. That prerogative lies initially with the United States Trustee.

To summarize, I hold that although the Movants have successfully demonstrated that the Debtors and Petitioning Creditors did

---

**25.** Debtors' Application to Appoint David Lichtenstein of D.G. Renewal Corp. as the Debtors' Responsible Person at ¶ 21.

orchestrate the filing of the eleven involuntary petitions commencing these cases, their behavior is not consonant with what is required by case law for collusion. As a result, the orchestration is not sufficient to warrant the dismissal of the cases without evidence that the Debtors have no chance at rehabilitation. The Movants, if they wish to press their motion, are to obtain a new hearing date to try this issue.

SETTLE ORDER consistent with this decision.