**In re Israel HALPERN, Debtor.**

**Bankruptcy No. 198–14837–352.**

United States Bankruptcy Court,
E.D. New York.

Jan. 22, 1999.

Hahn & Hessen LLP, New York City, By Gilbert Backenroth, John P. Amato, Mark Indelicato, Proposed Attorneys for Debtor.

Whitman Breed Abbott & Morgan LLP, New York City, By John M. Hadlock, Norman N. Kinel, Matthew L. Cantor, for the Wilf Group.

Michael T. Sucher, Brooklyn, NY, for Petitioning Creditor.

Office of the United States Trustee, Garden City, NY, By Alfred M. DiMino.

### DECISION ON THE WILF GROUP'S MOTION TO DISMISS CHAPTER 11 CASE WITHOUT A REVESTING

MARVIN A. HOLLAND, Bankruptcy Judge.

A secured creditor seeks (a) to dismiss this Chapter 11 case pursuant to 11 U.S.C. § 1112(a) and (b) to prevent property of the estate from re-vesting in the debtor for a period of 180 days, pursuant to 11 U.S.C. § 349(b)(3). After consideration of the papers presented, the proceedings herein, and the arguments of counsel, the Court agrees that dismissal without a revesting is an appropriate remedy given the debtor's persistent access to the courts, his apparent motivation, and the unjust effect upon his creditors occasioned thereby. An order to that effect has heretofore been entered. The purpose of this decision is to articulate the reasons for the dismissal.

#### Facts

Debtor Israel Halpern, together with Leonard A. Wilf,[1] Zygmund Wilf, JHW Construction Corp., and Joseph Wilf (the "Wilf Group" or Movant) were members of three

---

1. Individually and as the executor of the estate of Harry Wilf.

Manhattan real estate partnerships: WHW Associates which owned 37 Wall Street, Walwilhal Associates which owned 41–45 Broad Street, and J. Hill Associates which owned 110 Washington Street. After Halpern failed to pay his proportionate share of the net operating losses suffered by the partnerships for five years, the Wilf Group initiated litigation in New York State Court and obtained a judgment by default against Halpern for $5.7 million on October 30, 1995.

Halpern attempted to vacate the default judgment by arguing that he had been unaware of the motion for judgment on which he had defaulted. Both Justice Shainswit, the presiding state lower court judge, and the Appellate Division, First Department, refused to vacate the default judgment because they considered the excuse he had given for his default "demonstrably false." *Wilf v. Halpern*, 234 A.D.2d 154, 651 N.Y.S.2d 30 (1st Dept.1996).

The Wilf Group actively pursued collection of their judgment. On August 28, 1996 Leonard A. Wilf was appointed receiver of Halpern's interest in the J. Hill partnership to conduct a sale of that interest. An auction sale was prevented when Halpern filed a petition under Chapter 11 in the Bankruptcy Court for the Southern District of New York. The Wilf Group's prompt motion to dismiss pursuant to 11 U.S.C. § 1112(b) was granted by Judge Gallet's order dated February 19, 1997.

During a February 2, 1997 hearing on the motion Judge Gallet had inquired why he simply should not lift the stay to allow the sale of the J. Hill interest to go forward.

Halpern's counsel objected, arguing that any sale "would probably be credit bidding" that would not generate a surplus beyond the judgment amount.[2] Judge Gallet commented that he saw no equity in the partnerships based upon his review of the papers and that furthermore he did not "see where the reorganization [was] here." Judge Gallet also characterized Halpern's case as "a classic two-party fight" and stated that state law issues (i.e. partnership issues) raised by Halpern should be resolved in state court. The dismissal allowed Halpern's interest in the J. Hill partnership to be sold at public auction on February 28, 1997.[3]

Halpern then made another attempt to vacate the default on the basis of newly discovered evidence. On June 27, 1997 Justice Shainswit rejected Halpern's argument on two grounds: (1) that Halpern's evidence could not be characterized as 'newly discovered' and (2) that what Halpern then sought to place before the court would not have affected the outcome of the prior proceeding. Both Halpern and his counsel were sanctioned for their clear attempt to delay enforcement of a lawful judgment.[4]

In November 1997 Justice Shainswit, on the Wilf Group's application, charged Halpern's partnership interest in Whalwilhal Associates and WHW Associates with payment of the unsatisfied amount of the judgment and appointed Leonard A. Wilf receiver of Halpern's partnership interests. (See Mot. to Dismiss, Ex. 7 at 3). Between February 9, 1998 and April 7, 1998 Halpern made three unsuccessful efforts to stop or influence the sale of the Walwilhal partnership interest,[5]

---

**2.** At the hearing Halpern's counsel stated: "The sales going through would probably be credit bidding and won't [sic] be any money and we would have no ability to get back at these partnerships." (Mot. To Dismiss, Ex. 3 at 5.)

**3.** This interest was later reported as being sold for $1,000,000.00 sometime in 1997. Over a year later, Halpern unsuccessfully sought discovery regarding the auction sale to determine Wilfs' efforts to obtain a fair price and to account for the amount of the sales price that was credited against the judgment. The Supreme Court denied this relief because Halpern had not alleged that the "sale was conducted in an unfair or commercially unreasonable manner."

**4.** In her June 27, 1997 memorandum decision, Justice Beatrice Shainswit stated that "this motion [to vacate the judgment on the basis of newly discovered evidence] is the second attempt, without basis in law or fact by defendant and his attorneys, to stay plaintiffs' enforcement of a valid judgment." (Mot. to Dismiss, Ex. 6 at 4).

**5.** Halpern's first attempt, which requested discovery and a protective order modifying or regulating a sale of the Walwilhal interest then scheduled for February 13, 1998, was denied in a February 9, 1998 memorandum decision by Justice Shainswit in which she characterized Halpern's actions as an "eleventh hour attempt

the last ending with the New York State Supreme Court threatening severe sanctions if Halpern attempted another delay. A sale, scheduled for April 14, 1998, was derailed by the filing of the involuntary petition commencing this case.

*The Greenbaum Loan Transaction*

Halpern has been represented by several different attorneys at different stages of these proceedings. At some point in late 1997 Halpern borrowed $25,000 for 90 days on an unsecured basis for the purpose of paying his then counsel, the law firm of Herzfeld & Rubin. Halpern, who claims to reside in Israel with no assets in the United States aside from his remaining partnership interests, was able to borrow the money from a Jerome Greenbaum—a man who he had never met but who had had business dealings with his son, Baruch Halpern. After the loan became due, Greenbaum learned of the upcoming April 14, 1998 sale of Halpern's interest in Walwilhal Associates. Greenbaum then sought out Michael Sucher, an attorney, to have an involuntary bankruptcy proceeding commenced to stay the sale, so as to protect his interest as an unsecured creditor. Sucher was also contacted by Herzfeld & Rubin. A Herzfeld & Rubin attorney told Sucher he was sending Greenbaum to him as a potential client to commence an involuntary bankruptcy against Halpern.

*Proceedings Before This Court*

The involuntary chapter 7 case was commenced on April 13, 1998 by Jerome Greenbaum as the sole petitioning creditor. Pursuant to 11 U.S.C. § 706(a), Halpern converted this case to one under Chapter 11. Significantly, neither the Debtor's schedules nor anything else filed in this case disclose any property of the debtor located within this District, nor any other nexus which would justify this venue.

The Wilf Group promptly brought the instant dismissal motion and pursuant to 11 U.S.C. § 349(a) sought to preclude the debtor's assets from revesting ("the dismissal motion"). Both Debtor and Jerome Greenbaum filed opposition.[6] At argument on August 6, 1998, Halpern's counsel requested a month's adjournment until September 3, 1998—the return date of a motion filed the previous day by Halpern's counsel seeking, *inter alia*, approval of a proposed sale pursuant to 11 U.S.C. § 363(b) & (f). (the "Debtor's motion to approve the proposed sale") In Court, Halpern's counsel claimed he would have "an offer [on September 3] that will be sufficient to pay off all of the creditors and provide substantial equity to the debtor." (8/6/98 Tr. at 5.) The $70 million dollar "offer" to which Halpern's counsel referred was not for Halpern's interest in the partnership but rather for the fee interest in the Wall Street property owned by the WHW Associates partnership.[7] Wilf's counsel opposed the requested adjournment, saying 'Show me the money.'[8] (8/6/98 Tr. at 9). The Court

to block the sale." (Mot. to Dismiss, Ex. 8 at 3.) In his second attempt, Halpern sought to derail a sale scheduled for March 18 challenging the form of the notice of sale and the description of the property and requesting the court to modify certain aspects the sale. Justice Shainswit denied the motion in all respects. (Mot. to Dismiss, Ex. 9.) Finally, in his third attempt, Halpern, in addition to recycling previous arguments, sought to stay the sale based upon allegations that Wilf had discouraged bidders and utilized a biased appraiser. In addition to denying this application, Justice Shainswit cautioned that "a fourth attempt to frustrate the sale, based upon the same or similar arguments, will be met with severe sanctions..." (Mot. to Dismiss, Ex. 1 at 5.)

6. Although Sucher filed partial opposition on behalf of Jerome Greenbaum (simply seeking an optimal disposition of Halpern's property) he did not participate in subsequent proceedings before the Court.

7. During argument Halpern's counsel bandied many around many numbers and claimed then to have offers ranging from 62 to 80 million dollars for the Wall Street property. (8/6/98 Tr. at 41); *see also* Debtor's 7/30/98 Object. to Mot. to Dismiss at ¶¶ 15–17 (claiming up to four un-named real estate developers, groups, concerns, and "major real estate players" were "extremely interested" in the Wall Street Property with offers ranging between $63 to $80 million). So in asking for an adjournment, Debtor's counsel sought time to further assess these "offers" for the property.

8. Wilf's counsel informed the Court that they had unsuccessfully attempted to depose one prospective purchaser, but he would not answer even the most perfunctory of questions put to him such as his current address.

granted a brief adjournment to allow settlement discussions, and Halpern's counsel was put on notice that the adjournment was a one time opportunity.

Nothing came of subsequent discussions. On the September 3, 1998 return date, Halpern's counsel requested another adjournment. (9/3/98 4:30 p.m. Tr. at 11, 15, 19, 36, 40–41.) Blaming a wildly fluctuating stock market, Halpern's counsel reported that the original offer had been reduced from $70 million to $55 million dollars. Although his papers addressed only the original so called $70 million offer, Halpern's counsel orally stressed his efforts to find other purchasers even to the extent of publishing (without bankruptcy court authorization) solicitations in the New York Times (9/3/98 2:00 p.m. Tr. at 8), and talking to the City of New York, (9/3/98 4:30 p.m. Tr. at 17), claiming that given an opportunity he would "certainly try to have a good hard offer for $70 million." (9/3/98 4:30 p.m. Tr. at 40). At the close of the hearing the Court marked the motion submitted while allowing the parties a final opportunity to file papers. (9/3/98 4:30 p.m. Tr. at 43.)

### Discussion

The Wilf Group seek dismissal on the basis of collateral estoppel, the suspect nature of Greenbaum's involuntary petition, and bad faith. The parties were also asked to brief the issue of how the Wilf Group has been prejudiced by Halpern's repeated efforts to delay the Wilf Group from levying on Halpern's interests. Halpern's opposition focuses on the bad faith grounds and argues that the motion should be denied because he can reorganize if allowed to proceed with the sale of the entire 37 Wall Street property by exercising rights he has under the WHW Associates partnership agreement.

This case should be dismissed for two reasons: (1) the debtor is incapable of being reorganized; and (2) equitable considerations mandate recognition of the judgment creditor's claim to Halpern's partnership interest as of the appointment of the receiver. I turn first to two arguments raised in the Wilf Group's motion: the circumstances surrounding the filing of the involuntary and collateral estoppel.

*The Involuntary Petition*

A good portion of the Wilf Group's motion to dismiss is devoted to analyzing the Greenbaum loan and the ensuing involuntary bankruptcy to show that it was a debtor orchestrated scheme designed to forestall legitimate judgment enforcement. The Wilf Group argues that the involuntary was filed in the Eastern District to keep the case from being assigned to Judge Gallet, who had dismissed Halpern's prior voluntary petition. In support of this scenario the Wilf Group observes that Halpern chose to convert this case to one under Chapter 11 and stay in this District where he does not appear to have the residence, domicile, assets, or principal place of business required by 28 U.S.C. § 1408.

Halpern responds to the Wilf Group's allegations by asserting that 'there is not a scintilla of proof' to show that the involuntary proceeding was the product of collusion, (P. 4, doc. # 42), and arguing that a debtor induced involuntary petition, standing alone, is not grounds for dismissal. *See In re Kingston Square Assocs.*, 214 B.R. 713, 733 (Bankr.S.D.N.Y.1997) (analyzing cases).[9]

A determination of whether the circumstances surrounding the filing of the involuntary constitutes cause to dismiss this case would require further discovery and an extended hearing. However, since the record is sufficiently clear as to Halpern's consistent, persistent, and insistent tactics calculated to frustrate the legitimate enforcement of his former partners' judgment against him;

---

9. Halpern's argument goes no further—it lacks a simple flat denial of Wilf's allegation of collusion. His initial opposition to the instant motion argued that no cause existed to dismiss the case "even if the Court finds that the Debtor somehow orchestrated the filing of the Involuntary Petition." (7/30/98 Object. to Wilf Group's Mot. for an Order Dismissing Chapter 11 Case at ¶ 7.) And while Halpern does not have the burden of proof on the issue, the lack of a denial is significant in light of the long history of delay between the parties. Similarly, Halpern's counsel repeatedly observed that the prior bankruptcy filed in the Southern District was not dismissed with prejudice, but Debtor notably never made any attempt to move this case back before Judge Gallet.

no further hearing is required. *See In re C–TC 9th Ave. Partnership v. Norton Co. (In re C–TC 9th Ave. Partnership)*, 113 F.3d 1304, 1312 (2d Cir.1997)("When the record is sufficiently well developed to allow the bankruptcy court to draw the necessary inferences to dismiss a Chapter 11 case for cause, the bankruptcy court may do so").

*Preclusive Effects of Halpern's first failed Bankruptcy*

■ Judge Gallet granted the Wilf Group's motion to dismiss Halpern's first bankruptcy case after concluding that the dispute between the Wilf Group and Halpern was "a classic two party fight" involving issues better left to the state courts. The Wilf Group would have this Court give preclusive effect to those statements and dismiss this case on the basis of collateral estoppel. The Wilf Group observe that collateral estoppel applies to proceedings in bankruptcy court, *Katchen v. Landy*, 382 U.S. 323, 334, 86 S.Ct. 467, 475, 15 L.Ed.2d 391 (1966); *Chicot County Drainage District v. Baxter State Bank*, 308 U.S. 371, 375, 60 S.Ct. 317, 319, 84 L.Ed. 329 (1940), but their papers fall somewhat short of demonstrating its applicability.

■ "Under collateral estoppel [issue preclusion], once a court decides an issue of fact or law necessary to its judgment, that decision precludes relitigation of the same issues on a different cause of action between the same parties." *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 466–67 n. 6, 102 S.Ct. 1883, 1889–90 n. 6, 72 L.Ed.2d 262 (1982). Collateral estoppel precludes relitigation of an issue of fact when 1) the issue is identical to an issue actually litigated in a prior proceeding, 2) determination of that issue was necessary to the resolution of the earlier proceeding, and 3) the opportunity to litigate was "full and fair." *In re City Stores Co. v. The Mall, Inc.*, 42 B.R. 685, 688 (S.D.N.Y.1984) (quoting *Sprecher v. Graber*, 716 F.2d 968, 972 (2d Cir.1983).

Here, there can only be a question as to the first factor: whether the Wilf Group's instant 11 U.S.C. § 1112(b) motion to dismiss raises identical issues of fact as were actually litigated and decided in the initial bankruptcy. The Wilf Group stress that the same parties are involved—that the instant case is but the next chapter in the ongoing battle between Halpern and the Wilf Group—and downplay Greenbaum's involvement by arguing that the involuntary was a sham engineered by Halpern. However, giving preclusive effect to Judge Gallet's statements would not be appropriate because Judge Gallet's dismissal was predicated on different factual circumstances.

From the onset at the hearing, Judge Gallet asked why he simply should not modify the automatic stay to let sales go forward and keep the bankruptcy case. Halpern wanted the bankruptcy court to maintain the status quo between himself and the Wilf Group while he pursued his state court litigation, which involved Halpern's attempts to attack the partnership agreements and set aside the default. The decision to dismiss came after Halpern's counsel could not answer Judge Gallet's queries as to how Halpern could reorganize without going to the merits of the state court litigation. That exchange reflects a factual predicate for the first dismissal that is not comparable to issues currently before the Court in this case: Halpern has not asserted the need to proceed with the state court litigation in order to reorganize in this case and the J. Hill property was sold prior to the commencement of this case and therefore is no longer property of the estate in this case.

Judge Gallet stated that the dispute between the Wilf Group and Halpern was a two party dispute. Even is this were a finding of fact binding on this court, it would not, standing alone, mandate an automatic dismissal of this case. *See e.g. In re Kingston Square Assocs.*, 214 B.R. 713.

In any event, Judge Gallet, at the close of the hearings, did not make formal findings of fact and conclusions of law; he simply dismissed the case. Since the actual basis for the dismissal was neither clearly articulated at the dismissal hearing nor set forth in the order of dismissal, we are unable to determine the facts Judge Gallet's decision may have been predicated upon. *See In re Bono*, 70 B.R. 339, 343 (Bankr.E.D.N.Y.1987) (facts supporting application of collateral estoppel particularly strong where, *inter alia*, the

Court's findings were "not only noted on the docket, but also subsequently embodied in its formal order.").

*Dismissal Pursuant to 11 U.S.C. § 1112(b)(2)*

 "[C]ourts will dismiss Chapter 11 cases under [11 U.S.C. § 1112(b)(2) ] where the debtor lacks the ability to formulate a plan or carry one out." *In re Lizeric Realty Corp.,* 188 B.R. 499, 503 (Bankr.S.D.N.Y. 1995). A lack of assets makes an effective plan of rehabilitation unlikely and provides support for a dismissal. *In re Roma Group, Inc.,* 165 B.R. 779, 780 (S.D.N.Y.1994). In this case, Halpern has pegged his reorganization on being able to effect the sale of the Wall Street property (at a price he claims will more than satisfy the Wilf Group and other creditors). For the reasons discussed below, Halpern may not proceed with such a sale, and he is thus left without means to fund a plan of reorganization.

The Wall Street property is the principal asset of WHW Associates, a general partnership in which Halpern has a 25% partnership interest and the Wilf Group has the remaining 75% interest. The WHW Associates partnership agreement contains a sales provision that allows a partner to bring a qualified purchaser before WHW and commits the partnership to the sale if the other partners do not meet the terms of the offer. Halpern claims to have found a purchaser for the Wall Street property, and, in his capacity as a debtor in possession, has sought authorization from the Court to proceed with a sale under the terms of the partnership agreement.

Halpern moves pursuant to 11 U.S.C. § 363(b) & (f).[10] 11 U.S.C. § 363(f) allows a trustee to sell property of the estate free and clear of any interest of an entity other than the estate under specified conditions. *In re Funneman,* 155 B.R. 197, 200 n. 8 (Bankr. S.D.Ill.1993) (citing *In re Manning,* 831 F.2d 205, 207 (10th Cir.1987)).[11]

The problem for Halpern is that the Wall Street property is not a part of his bankruptcy estate. *See Id.* at 200 (partnership assets could not be sold in § 363(f) sale). The actual Wall Street property is a partnership asset of WHW Associates.

 "[I]t is well settled that assets owned by a partnership are not included in the bankruptcy estate of an individual partner. The only 'partnership property' before the court during an individual partner's bankruptcy is the partner's personal property interest in the partnership, which consists of the individual partner's interest, if any, in the partnership assets after an accounting and payment of partnership debts out of the property belonging to the partnership." *Id.* (internal quotations and citations omitted).

Additionally, Halpern has moved pursuant to section 363(f)(3) which allows a sale of property of the estate *only if* the interest held by the non-estate entity *"is a lien* and the price at which such property is to be sold is greater than the aggregate value of all liens *on such property.*" 11 U.S.C. § 363(f)(3) (emphasis added). Here, there is no lien on the property which Halpern seeks

10. Halpern does not move under 11 U.S.C. § 363(h). That section provides that a trustee may sell both the estate's and the interest of any co-owner in a property, so long as the debtor had an undivided interest as a tenant in common, joint tenant, or tenant by the entirety in the property. Courts have not allowed trustees or debtors to proceed under 11 U.S.C. § 363(h) where, as here, the property is held in a tenancy in partnership "[b]ecause tenancy in partnership is a well recognized form of tenancy, [that] Congress would have included [. .] among the tenancies expressly covered by the statute if that were the intention." *In re Normandin,* 106 B.R. 14, 15 (Bankr.D.Mass.1989); *Goldberg v. South East Partners Corp. (In re Sturman),* 222 B.R. 694, 708 (Bankr.S.D.N.Y.1998) (citing cases). Title to the property was not raised as an issue, and

section 5 of the WHW Associates partnership agreement provides that title to the property shall be in the name of the partnership.

11. 11 U.S.C. § 363(b)(1) & (f)(3) provide:

 (b) (1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

 (f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property.

**74**

to sell. The Wilf Group's lien, arising out of the charging order and the receivership of Halpern's partnership interest, attaches only to Halpern's partnership interest and not to the property which Halpern seeks to sell pursuant to section 363(f)(3)—the actual Wall Street property, which is owned by the partnership. 11 U.S.C. § 363(f)(3) is therefore neither applicable nor available to Halpern's sale of the Wall Street property.

*Dismissal Pursuant to 11 U.S.C. § 1112(b)(3)*

■■■ Cause must exist to dismiss a debtor's case. *See* 11 U.S.C. §§ 707(a); 1112(b); 1208(c); 1307(c).[12] Rather than limiting 11 U.S.C. § 1112(b) with a precise definition of 'cause', the statute provides a non-exclusive list of ten instances constituting adequate 'cause' for dismissal.[13] "[U]nreasonable delay by the debtor that is prejudicial to creditors" is the third example of such cause. "Although most decisions under § 1112(b)(3) have focused on the time taken by a debtor, after filing the case, to submit a confirmable plan, pre-filing delay [... has] also been cited as evidence of unreasonable delay under this 'cause.'" *In re N.R. Guaranteed Retirement, Inc.,* 112 B.R. 263, 277 (Bankr. N.D.Ill.1990), aff'd, 119 B.R. 149 (N.D.Ill. 1990) (citations omitted).

Attached to their moving papers, the Wilf Group has provided copies of prior court decisions in cases in which Halpern and the Movant were parties. These exhibits clearly demonstrate that no court that has addressed any aspect of this dispute has perceived any merit to Halpern's position. Halpern's only success has been in obtaining delay in enforcement of the judgment against him, to the continued frustration of his legitimate creditors. Halpern first stalled the sale of the J. Hill Associates partnership interest, and he then stalled the Wilf Group from proceeding against the Walwilhal partnership interest. While the Wilf Group, as a judgment creditor with a charging order against Halpern's remaining partnership interests, has been entitled to proceed against those assets to the extent needed to satisfy their judgment, Halpern has obtained years of delay prior to the commencement of this case, and close to another half year of delay in this Court at the Wilf Group's expense.

The prejudice resulting from Halpern's delay is apparent and requires little discussion. There are the obvious financial costs in responding to Halpern's constant barrage of legal proceedings. Then there are the opportunity costs incurred by the Wilf Group in

**12.** *11 U.S.C. § 1112(b) provides:* "Except as provided in subsection (c) of this section, on request of a party in interest or the United States trustee or bankruptcy administrator, and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, including—
 (1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;
 (2) inability to effectuate a plan;
 (3) unreasonable delay by the debtor that is prejudicial to creditors;
 (4) failure to propose a plan under section 1121 of this title within any time fixed by the court;
 (5) denial of confirmation of every proposed plan and denial of a request made for additional time for filing another plan or a modification of a plan;
 (6) revocation of an order of confirmation under section 1144 of this title, and denial of confirmation of another plan or a modified plan under section 1129 of this title;
 (7) inability to effectuate substantial consummation of a confirmed plan;
 (8) material default by the debtor with respect to a confirmed plan;
 (9) termination of a plan by reason of the occurrence of a condition specified in the plan; or
 (10) nonpayment of any fees or charges required under chapter 123 of title 28."

**13.** Issues arising under 11 U.S.C. § 1112(b) are commonly analyzed in terms of whether the petition was filed in good or bad faith. *See e.g. In re C–TC 9th Ave. Partnership,* 113 F.3d at 1310–11. The use of good/bad faith as a policing mechanism, however, does not lend itself to precise definition, *see In re Island Helicopters,* 211 B.R. 453, 461(citing cases), creates uncertainty, *see In re Victory Const. Co. Inc.,* 42 B.R. 145, 149 (Bankr.C.D.Cal.1984) (inability of counsel to frame issues), and clouds analysis, *see In re Gucci,* 174 B.R. 401, 410 (Bankr.S.D.N.Y.1994) (Court observing that "[a]lthough bad faith is often cited as cause, generally such cases are really dismissed for specific reasons that make chapter 11 relief inappropriate under the circumstances, and usually those reasons constitute one of the specific causes identified in section 1112(b)").

the context of their ownership interests in the partnerships. By not being able to resolve the extent to which Halpern's partnership interests will be foreclosed upon, the Wilf Group has been unable to determine how best to finance and manage the properties. (*See* Movant's Brief in Further Supp. to Dismiss at ¶¶ 6–7.)

In contrast to the harms suffered by the Wilf Group is the benefit received by Halpern. There is no argument that the value of the properties (and the commercial real estate market for lower Manhattan) has been increasing over the past several years.[14] Had the Wilf Group's efforts to collect on their judgment by enforcement of the charging order never been delayed (back when the properties had a lower market value), Halpern's interests may well have been extinguished had the Wilf Group had an opportunity to obtain them by "credit bidding." Halpern is using any means available, proper or improper, to delay a sale of his partnership interests until property values swing high enough for there to be something left for him after payment of his obligations out of his share of the proceeds of a sale of partnership property. Equitably, the benefit of such upswing should accrue to the Wilf Group, not to Halpern.

Furthermore, there is no reason why the type of sale that Halpern says he now seeks could not have been pursued before Judge Gallet had Halpern's true motivation been to reorganize.[15] Instead, more than a year after dismissal of the first case Halpern disingenuously claims that he has "garner[ed] the necessary evidence to support a reorganiza-

tion effort" and "is now ready willing and able to demonstrate that he has substantial equity in the partnerships...." (Debtor's 9/10/98 Response at Pages 4–5.) It is clear from the state court decisions that Halpern turned his back on his partnership obligations in the early 1990's, (see Mot. to Dismiss, Ex. 22), and now, with the properties increasing in value, Halpern stands before this Court 'ready willing and able' to go forward with a sale, claiming equity in the properties. Halpern makes these representations only after years of litigation that has prejudicially delayed the Wilf Group.[16] If he were now able to go forward and fund a plan by selling the properties, he would be reaping the benefit of his own delay because those assets are more valuable now than they were in 1995 (the time of the initial judgement) or November, 1997 (when the remaining properties were charged with the unsatisfied part of the judgment).

Halpern also seeks an additional benefit from this second attempt at reorganization. Halpern would use the turnover provision in the Bankruptcy Code (11 U.S.C. § 543) to have the state court appointed receiver surrender Halpern's partnership interests so Halpern could attempt a sale under the terms of the partnership agreement. (See 9/3/98 2:00 p.m. Transcript at 22).

Taken together, the prejudice suffered by the Wilf Group coupled with the benefit derived by Halpern from his unrelenting pattern of delay, establish the cause necessary to dismiss this case pursuant to 11 U.S.C. § 1112(b). Nevertheless Halpern's counsel

---

**14.** For example, New York City may well be interested in the Broad Street Property as part of new home for the New York Stock Exchange. The Debtor brought this fact to the Court's attention by citing an article published during the time Halpern sought to delay the sale in state court. (*See* Ex. 1 to Debtor's 9/10/98 Resp., *Big Board May Get New Trading Floor, Wall Street Journal*, 02/19/98). *See also* 8/6/98 Tr. at 5 (Halpern's counsel observing that "the bottom line" was that someone was willing to offer substantially more for the Wall Street property than a prior appraised value.)

**15.** The February 6, 1997 transcript of the hearing before Judge Gallet shows that Debtor's then counsel's primary concern was having the Bankruptcy Court maintain the status quo between

Halpern and the Wilf Group while Halpern attempted to attack the partnerships in state court.

**16.** After an earlier sale had been successfully delayed by Halpern's first filing in the Southern District, the J. Hill partnership interest was sold at public auction in early 1997. Halpern's remaining partnerships interests (a 50% interest in the Walwilhal partnership that owns the Broad Street property and a 25% in the WHW partnership that owns the Wall Street Property) were charged by Justice Shainswit with payment of the unsatisfied judgment, which the parties agree is in now excess of $6 million. Halpern then delayed the Wilf Group's attempt to sell the Walwilhal interest in the state court for over a year, *see infra* n. 5., prior to the filing of this case.

has asked that this case not be dismissed, whether or not Wilf succeeds in showing cause. Counsel argues that Halpern should be allowed to proceed in Bankruptcy and attempt to reorganize by selling the Wall Street property.[17]

The time for reorganization, however, has already passed. The prior proceedings in the State Court and in the Southern District speak for themselves. In this case, Halpern was given the opportunity that he asked for in order to find a buyer at the price and on the terms as he requested. He was unable to do so. While counsel for Halpern repeatedly claimed to be able to find a purchaser to provide the needed funds to fuel the reorganization, none ever materialized.[18] Settlement discussions were unsuccessful. Halpern's long history of delay militates against a further moratorium under the guise of an attempt to reorganize in this court, see In re Parsons, 137 B.R. 879 (Bankr.D.D.C. 1992)(cases dismissed where debtor intended to delay filing plan of reorganization until after the resolution of his appeal from adverse district court decision that triggered filings), and his opposition to the dismissal motion (and his motion to approve the proposed sale) falls well short of showing wheth-

er a reorganization is in fact possible. See Matter of Growers Properties No. 56 Ltd., 117 B.R. 1015, 1020 (Bankr.M.D.Fla.1990) (question of equity in the property not considered by court dismissing case where petitions were filed to frustrate creditor).

Halpern's counsel attributes his delay and lack of success to volatility in the financial markets. The original $70,000,000 so called offer was reduced to $55,000,000 in the space of but a few weeks. This gave Halpern an excuse to request additional time. Such market volatility, however, adversely affects the Wilf Group to an even greater extent than it affects Halpern. The Wilf Group is not being compensated for this added risk while Halpern seeks out a buyer. By Halpern's own representations, the volatility of the market has driven at least one prospective offeror from a higher to a lower offer. It is simply not fair to impose such risk upon the Wilf Group, a foreclosing judgment creditor.

### Equitable Considerations

Putting aside, for a moment all of the above technical discussion, what Halpern has been doing and what he seeks to continue is what gamblers call "betting with the other

---

**17.** Halpern makes this argument in response to issues raised by the Court and in response to the bad faith analysis made in Wilf's motion. In the bad faith context, Halpern, quoting from In re Kingston Square Assocs., 214 B.R. at 724 ("The standard in this Circuit is that a bankruptcy petition will be dismissed if both objective futility of the reorganization process and subjective bad faith in filing the petition is found."), argues that this case cannot be dismissed on the basis of bad faith unless "**both** objective futility of the reorganization process **and** subjective bad faith in filing the petition is found." (Debtor's Object. Mot. Dis. at ¶ 11.) Such an interpretation places a disproportionate burden on Movant. For example, under Halpern's standard a debtor acting in bad faith but possessing the "objective" means to reorganize could use bankruptcy as a safe haven to delay and frustrate creditors. Moreover, the Court in Kingston Squares relies on dicta from the Second Circuit's decision In re Cohoes Indus. Terminal, Inc., 931 F.2d 222, 227 (2d Cir.1991). In re Cohoes involved the award of sanctions under Fed.R.Bankr.P. 9011 for the filing of a frivolous petition, not a dismissal pursuant to § 1112(b). As part of its analysis the Second Circuit observed, without citing other Second Circuit authority, that "[a] petition for Chapter 11 bankruptcy may be deemed frivolous if it is

clear that on the filing date there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually would emerge from bankruptcy proceedings." Therefore, this observation does not qualify as controlling authority in this Circuit and unduly restricts the broad 'for cause' standard found in § 1112(b). The Wilf Group has established ample cause for dismissal under § 1112(b) and now the burden shifts to the debtor to show that, despite such cause, there exists a reasonable prospect of reorganization within a reasonable amount of time. See In re Woodbrook Associates, 19 F.3d 312, 317 (7th Cir.1994) (observing that fact that movant bears burden on motion to dismiss does not eviscerate debtor's obligation to produce evidence in opposition to a well-supported motion). Debtor has not succeeded in making such a showing. In any event, the bad faith analysis is not necessary to the disposition of this case as the dismissal herein is predicated on 11 U.S.C. § 1112(b)(2) & (3) and other equitable considerations.

**18.** It is worthy of note that Halpern has been making "vague statements about better deals being available" for the Wall Street property in court proceedings for the better part of this decade. (See Mot. to Dismiss, Ex. 22 at 7.)

guy's money." The gamble is the hope that if he is able to delay liquidation long enough, the market will turn and he will be able to salvage something out of a sale after payment of his obligation to his partners. The market swing both ways. If the market declines, the Wilf Group loses while Halpern, having nothing more to loose, can not be hurt. Therefore, Halpern has nothing to loose and everything to gain. The Wilf Group not only has nothing to gain and everything to loose, they also loose the time value of the money to which they are entitled, as well as the cost of the legal enforcement of that to which they have long been entitled.

Let the games end!

### Dismissal Without a Revesting

■ Halpern's first attempt to reorganize came before Judge Gallet who dismissed the case, concluding that he did not see the prospect of reorganization. Halpern then sought to influence and delay the sale of the Whalwilhal partnership interest (Broad Street) before the state court until Justice Shainswit raised the prospect of sanctions. Finally, before this Court, Halpern was give an opportunity to come up with a firm bid for the Wall Street property—but on the return date he failed to produce the $70 million dollar purchaser referenced in his motion, although he proffered a suspect $55,000,000 offer which, as explained above, could not have been consummated.

This Court recognizes that at least as of November 1997, when the Supreme Court granted Wilf's application for a charging order attaching Halpern's remaining partnership interests and appointed Leonard A. Wilf receiver of Halpern's partnership interests, the Wilf Group has had an equitable interest in the property such that in view of Debtor's previously demonstrated inability to reorganize they were entitled to expose Halpern's partnership interests to a public sale where they could have either had their judgment satisfied or "credit bid" up to the amount of their judgment and obtain title to the property, thereby giving themselves the benefit of a reasonably expected increase in value of the property.

■ Once recognizing the Wilf Group's equitable interest in the property and equitable entitlement to any appreciation in value, the only way to best assure that the Wilf Group will be able to realize this appreciation is by fashioning a remedy such that no matter what the Debtor seeks to do he will not be able to frustrate the Wilf Group's further attempt to foreclose upon the property. A principal goal of a court of equity is to undo unjust results and to minimize injustice—and the best way to undo injustice in this instance is to move toward a sale with the least delay. The Wilf Group has asked for a dismissal of the case without a revesting for 180 day period. *See In re Prud'Homme*, 161 B.R. 747 (Bankr.E.D.N.Y.1993). This would immunize the property from the stay contained in 11 U.S.C. § 362 stay should a further filing be made by or against the Debtor because the property would not be property of the estate in that case. Given the imaginative solutions which the debtor has come up within the past it is impossible for me now to determine whether the 180 day period would be excessive or insufficient. I believe that the Wilf Group is entitled in principle to the type of relief they seek, and therefore I am prepared to permit the Wilf Group to settle an order dismissing the proceedings without revesting of title to any property of the estate to be suspended subject to further application by the debtor on notice to all creditors.

### Conclusion

1. This court has jurisdiction over the instant matter pursuant to 28 U.S.C. §§ 157 & 1334 and the Standing Order of Referral of Cases to Bankruptcy Judges for the Eastern District of New York, dated August 28, 1996. The Wilf Group's motion to dismiss the Debtor's chapter 11 case is a core matter within 28 U.S.C. § 157(b)(2)(A).

2. The Wilf Group's motion to dismiss the debtor's chapter 11 case has been granted, pursuant to 11 U.S.C. § 1112(b)(2) & (3) and on the equitable considerations discussed herein.